IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 22, 2004 Session

## MARJORIE DELAPP, ET AL. v. ARTHUR DAVID PRATT, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF MARY A. PRATT
### In re: Estate of Mary Armstrong Pratt

Appeal from the Chancery Court for Knox County
No. 55894-3     Sharon Bell, Chancellor

FILED JUNE 22, 2004

No. E2003-02213-COA-R3-CV

Marjorie Delapp, Mary Sherrod, and Elsie Caton[1] ("Plaintiffs") sued their brother, Arthur David Pratt ("Defendant") claiming, in part, that Defendant exercised undue influence over their mother, Mary Armstrong Pratt ("the Deceased") to induce the Deceased to make a will in Defendant's favor. After a jury trial, judgment was entered holding the Deceased was competent to make the will, that a confidential relationship existed between Defendant and the Deceased, and that the will was not the last will and testament of the Deceased. Defendant appeals claiming, in part, that the Trial Court erred in allowing testimony regarding his alleged racial prejudice to be introduced and in failing to grant a mistrial after reference was made to his alleged sexual misconduct. Defendant also argues there is no material evidence to support the jury's verdicts of confidential relationship and undue influence and that the Trial Court erred in denying his objection to the entry of judgment. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., E.S. and CHARLES D. SUSANO, JR., J., joined.

Christopher J. Oldham and Gerald L. Gulley, Jr., Knoxville, Tennessee, for the Appellant, Arthur David Pratt.

Johnny V. Dunaway, La Follette, Tennessee, for the Appellees, Marjorie Delapp, Mary Sherrod, and Elsie Caton.

---

[1]While another sister, Gaylea Anderson, was a named plaintiff in the complaint to contest the will, an order was entered prior to trial allowing Gaylea Anderson to withdraw voluntarily as a plaintiff. Ms. Anderson did not appear at trial.

# OPINION

## Background

Plaintiffs sued Defendant regarding the will executed by the Deceased on October 5, 1993 ("1993 will"). Plaintiffs claimed that the Deceased was not competent to make the 1993 will and, that Defendant exercised undue influence upon the Deceased to induce the Deceased to leave him, among other things, a family farm totaling approximately twenty-six acres.

The Deceased received the farm as a bequest under her father's will. The Deceased and her husband lived on this farm for many years and raised their nine children there. The Deceased never transferred any ownership in the farm to her husband. Years before her death, however, the Deceased deeded a portion of the farm to Defendant so that he could build a house there and deeded another portion to another son, Dale Pratt. Defendant built a house next door to the Deceased's house in the early 1980's and has lived there with his wife ever since while farming both his and the Deceased's land.

Plaintiffs later filed a second complaint seeking, among other things, to impose a constructive trust upon $40,000 that Defendant transferred from the Deceased's checking account into Defendant's own account prior to the Deceased's death.

The issues in this case were hotly contested. Eight of the Deceased's nine children survived her. Several of the Deceased's grown children testified at trial in support of Plaintiffs' case. However, several of their siblings testified favorably for Defendant.

The Deceased made a will in 1984 ("1984 will") drafted by Attorney Rainwater that divided the farm equally among her children. In 1993, the Deceased made another will drafted by Attorney Holbrook that left the farm in its entirety to Defendant. The Deceased also made a handwritten codicil that disposed of items of personal property leaving specific pieces to each of her children. The codicil, which was started in 1985 , was written in a notebook that the Deceased kept around the house and which was added to by the Deceased over the years.

The Deceased died in December of 1998 at the age of 85. After the Deceased died, Defendant made lists of the items named in the codicil and sent each brother and sister a list only of the items given to them. Plaintiff Mary Sherrod testified she did not get an opportunity to read the actual codicil until trial and at that time she stated there were more items listed in the codicil to go to her than were in the list Defendant sent her.

After the Deceased died, Defendant, who was named executor of the estate in the 1993 will, attempted to have the 1993 will admitted to probate. Defendant also had been named as a potential executor in the 1984 will along with another of the Deceased's sons, Gilbert Pratt, who

predeceased his mother. At trial, it was stipulated that the 1993 will drafted by Attorney Holbrook was properly executed. The 1993 will was entered into probate.

Attorney Holbrook testified at trial regarding the drafting of the 1993 will. He stated that he initially met with the Deceased and her daughter, Carolyn Copeland. Attorney Holbrook testified that according to his notes, the Deceased "indicated that her son, [Defendant], lived beside her and took care of her. And for that reason, she wanted him to have the entire estate." Attorney Holbrook clarified that the Deceased was leaving some of her tangible personal property to each of her other children. Attorney Holbrook also prepared a power of attorney signed the same day as the will that gave Defendant power of attorney.

The Deceased's daughter, Carolyn Copeland, also testified about the making of the 1993 will. She accompanied her mother to the first meeting with Mr. Holbrook and testified the Deceased brought a notebook with her to that meeting. Ms. Copeland testified that the Deceased told Mr. Holbrook what she wanted done and said she wanted to leave the farm to her oldest son, Defendant. Ms. Copeland testified the Deceased loved the farm and told her:

> [s]he wanted to keep the farm as a whole because she said it wasn't enough to give to all of us. And she wanted - - she said that [Defendant] and I were the only ones that would farm it because we were the only ones interested in farming. . . . And she said that it was Biblical to give the older son land or property, estate. . . .

Ms. Copeland has no doubt that it was the Deceased's intent for Defendant to get the farm.

Defendant testified he had no knowledge of the 1984 will until this lawsuit. He testified that the Deceased told him in 1993, the she wanted to talk to him and sat down with him and told him she was going to give him the farm.

Other siblings also testified to their belief that the 1993 will reflected the Deceased's wishes. Alice Sims, another of the Deceased's daughters, stated she has "no doubt whatsoever this [distribution under the 1993 will] is what [the Deceased] wanted. . . ." Dale Pratt, one of the Deceased's sons, stated his mother loved the farm and told him she wanted it to remain a farm. Dale Pratt testified he believes the 1993 will was what the Deceased wanted.

Defendant accompanied the Deceased and Ms. Copeland to Attorney Holbrook's office the day the will was signed. He testified he did so at his mother's request. Defendant drove the Deceased to Attorney Holbrook's office and they met Ms. Copeland there. All three were given a copy of the will to review. Defendant testified that after they reviewed the will, he and Ms. Copeland were asked to go back to the lobby while the will was signed. Defendant maintains he had nothing to do with drafting the will, but rather simply acceded to his mother's request to be there when it was signed. He stated his mother was not easily influenced to do anything. Defendant testified he never used the power of attorney. Defendant also testified he has had possession of the original 1993 will since 1996.

Plaintiffs tell quite a different story. Plaintiff Marjorie DeLapp says Defendant talked to her about his concern that he was not going to get all of the farm. So, in the late 1980's or early 1990's Ms. DeLapp asked the Deceased if she planned to leave the farm to Defendant. Ms. DeLapp stated that the Deceased told her that the farm was going to be divided among all her children. Plaintiff Mary Sherrod testified the Deceased told Ms. Sherrod she'd made a will that divided everything equally.

Ms. DeLapp testified she had no knowledge of the 1993 will until after the Deceased's death. Ms. DeLapp knew that the Deceased had a will prepared by Attorney Rainwater that divided everything equally among her children and stated that the existence of this will was common knowledge among the family. Some other siblings also testified they were unaware of the existence of the Deceased's wills prior to the Deceased's death. Alice Sims testified she did not know about the 1984 or the 1993 wills, but did know about the handwritten codicil, which she thought actually was the will. Dale Pratt testified he did not know anything about the 1984 will prior to this lawsuit.

Several witnesses testified regarding the Deceased's mental status. Ms. DeLapp explained that she left home in the 1970's to get married and returned with her husband to live on the farm with the Deceased in the late 1980's. Ms. DeLapp and her husband, Steve DeLapp, have since divorced. Ms. DeLapp and her husband lived on the farm with the Deceased for approximately a year and a half. Ms. DeLapp testified regarding the Deceased's mental status during the time she and her husband lived with the Deceased and stated that the Deceased loved to watch the television show Matlock but would be confused about the storyline and one time thought she actually was on the show. She also testified the Deceased watched the Clarence Thomas confirmation hearing on television and when reference was made to a Coke can, the Deceased thought it was an advertisement for Coke. Further, Ms. DeLapp testified about one incident when the Deceased told Ms. DeLapp she had chicken and dumplings on the stove but it was really a pan with socks boiling in it.

Steve DeLapp also testified regarding the Deceased's mental status during the time he lived with her. Mr. DeLapp stated there were "times when she couldn't hear, would go off kind of in another world, sort of. Little things like not certain of reality. She'd see something on T.V. and think it was a news program and, I think, it was - - and I think it was a soap opera. We would correct her. And the next day, the same thing would happen. . . ." During the time frame between 1990 and 1993, Mr. DeLapp noticed the Deceased "losing track of where she was and what she was doing."

Ms. Sherrod testified that between 1990 and 1993, she observed that the Deceased "was unable to carry on a conversation at times. She could look at you and not know who we were. She couldn't answer questions."

Paul Caton, the Deceased's son-in-law and husband of Plaintiff Elsie Caton, prepared tax returns for the Deceased for approximately fifteen or sixteen years. Mr. Caton testified the

Deceased's record keeping was "immaculate." However, Mr. Caton noticed a change in the early nineties. He testified that the Deceased didn't have all of the information ready for him as she had each previous year. He stated the Deceased wasn't happy with the return he prepared that year so he didn't file it for her and she never asked him to do her taxes again. In 1992 or 1993, Defendant started taking the Deceased to have her taxes prepared by H&R Block, which is where he had his prepared.

To the contrary, several witnesses testified they noticed no problems with the Deceased's mental status around the time the 1993 will was executed. Defendant testified he never noticed any problems with the Deceased mentally and claims none of his siblings talked to him about any such problems. Defendant testified he did notice the Deceased's mental state getting worse in 1997, after she moved in with him and his wife. Dr. Richard Erickson, a retired family physician, who treated the Deceased from approximately 1977 until 1995, testified the Deceased was "unusually sharp for her age." Dale Pratt also testified the Deceased was "sharp as a tack" until about a year before she died. Carolyn Copeland, who during the time period from approximately 1988 until 1998, talked to the Deceased on the phone at least every other day and visited about every two weeks or so testified she did not notice any mental problem with the Deceased until 1997.

Ms. DeLapp testified that after she and her husband moved out of the Deceased's home, she continued to visit the Deceased almost every weekend until 1993. Ms. DeLapp testified that in approximately 1993, her visits to the Deceased decreased because Defendant would make racist jokes in front of Ms. DeLapp's adopted minority children. Ms. Delapp also testified that Defendant would brag about how when he lived in Florida he would pick up "little black boys on the road" who were hitchhiking and scare them by "flying down the highway . . . past the stop where they were supposed to let them out." Steve Delapp also testified to Defendant's racial prejudice.

Plaintiff Mary Sherrod testified she heard Defendant use racial slurs in regard to Ms. DeLapp's children on numerous occasions. Ms. Sherrod also testified that she and her husband accompanied Defendant on a fishing trip in July of 1977, to St. George Island when Defendant picked up a young black boy who was hitchhiking. Ms. Sherrod stated Defendant had the boy climb in the back of the pickup with his bike and Defendant then sped past the stop where the boy wanted to be let out. When asked what she did on that occasion, Ms. Sherrod stated "I was terrified. I was scared of [Defendant]. Nobody ever crossed him."

Defendant denied ever saying anything negative about Ms. DeLapp's children. He also denied the stories about picking up hitchhiking boys in Florida. Defendant stated he doesn't know why Ms. DeLapp stopped visiting the farm.

In 1992, the Deceased added Defendant's name to her checking account giving Defendant joint rights of survivorship. Defendant claims he never wrote a check without discussing it with the Deceased first. In November of 1997, prior to the Deceased's death, Defendant transferred $40,000 out of the joint account because he says the Deceased wanted him to do so.

Defendant testified the Deceased had told him around September of that same year to do this. Defendant testified:

> She said that at her death she didn't want any money distributed. And she said there are three girls that are going to fight you on my will. She said, they won't fight you on the farm, but they're going to fight you on the money. And she said, so I want it put over in your name.

Defendant testified he used some of the $40,000 to pay taxes and insurance on the Deceased's property. During his deposition taken in August of 1999, Defendant claimed that he had not touched the $40,000, but he admitted at trial that he had since spent some of it. Defendant testified he spent about $800 per year out of the $40,000 on land taxes since the Deceased's death in 1998, or around $3,200. However, Defendant denied he had used any of the $40,000 to pay taxes on his own nine acres. Defendant also testified he spent about $400 per year for four years insuring the Deceased's house and its contents and also spent some money for attorney fees. Defendant testified there is about $24,000 left out of the $40,000.

Defendant testified that there was $12,000 left in the joint account after the transfer of the $40,000. He stated, "[s]he told me to leave ten thousand in the checking account to bury her." Of that $12,000, Defendant used approximately $6,000 to pay for the Deceased's funeral expenses and then transferred the rest into his checking account. He claims that if called upon as executor of the estate to give an accounting of every dollar he is prepared to do this.

Ms. DeLapp testified that while she and her husband lived with the Deceased, Defendant would "come down and get the checkbook from [the Deceased] to write checks for things." Steve DeLapp testified that during the time they lived there, Defendant quite often would bring the Deceased her checkbook and tell her that he had written a check. Defendant, however, claims he never wrote checks on the Deceased's account while Ms. DeLapp and her husband lived with the Deceased. He testified he wasn't even on the account yet.

In 1992 or 1993, Defendant sold the Deceased's tractor, for $5,000 and did not put the money in the Deceased's account. In addition, Defendant traded a Toyota he owned for a Mercury owned by the Deceased. Defendant later took the Deceased's Toyota and sold it and bought himself a pickup truck using the money from the car.

Plaintiff Mary Sherrod testified that during the time period from about 1980 until 1991, she visited the Deceased at least weekly. For years Ms. Sherrod visited the Deceased on Sunday afternoons, but suddenly in 1993 the situation changed. Ms. Sherrod testified she would arrive for her usual visit and find the Deceased not at home. Ms. Sherrod stated she would leave a note. Later, she would find out that Defendant had taken the Deceased for a drive and the notes never would be acknowledged. Ms. Sherrod also testified that during the time frame between 1990 and 1993, when her family would visit with the Deceased, Defendant suddenly would appear and sit there with them during their visit.

Ms. Sherrod testified that sometime between 1976 and 1978, the Deceased asked her to co-sign on a safe deposit box. The Deceased gave Ms. Sherrod a key to that box. Ms. Sherrod entered the box once to store some valuables during a vacation and once to retrieve her valuables, but she never looked at what the Deceased had stored in the box. Ms. Sherrod stated the Deceased was a very private person. Ms. Sherrod testified her name was on the box for probably fifteen years or more until the early 1990's when the Deceased asked for the key back.

Ms. Sherrod testified regarding other changes she noticed in the Deceased's life in the early 1990's. Ms. Sherrod stated that for years, the Deceased had flowers along her driveway and that she was very proud of them. Ms. Sherrod testified that in approximately 1990, the Deceased told Ms. Sherrod that Defendant said she wasn't able to care for her flowers anymore and so he plowed them under. Ms. Sherrod also testified that Defendant started getting the Deceased's mail because the Deceased was unable to walk down to the mailbox anymore.

Alice Sims, another one of the Deceased's daughters testified she visited the Deceased about once a week from 1991, until the Deceased's death and, unlike Ms. Sherrod, never had any problem visiting with her. Ms. Sims also testified that the Deceased assisted her in the early 1990's by accompanying Ms. Sims to treatments when Ms. Sims underwent chemotherapy for cancer in late 1991 and early 1992.

At some point in 1997, the Deceased moved in with Defendant and Defendant's wife, Cricket. Defendant testified he paid Cricket using money from the Deceased's account to take care of the Deceased after the Deceased moved in with them. He stated:

> I didn't pay [Cricket] anything from when [the Deceased] moved in in February of '97 until September of '97. And [the Deceased] asked me - - she told me when she come up there she wanted me to pay Cricket. And she asked me, she said, are you taking care of paying Cricket? And I said, Mama, I'm taking care of it. And so I started paying Cricket four hundred a month. And I did that, I don't really know, but for a while. And maybe some time in '98, I think, for three or four months, I paid her six hundred a month. Mother was getting a lot worse. And then in September of '98, for four months, I paid her a thousand dollars a month.

Defendant testified that Cricket was not working outside the home during this time.

The case was tried before a jury in July of 2002, and the jury was asked to answer three questions. The first question asked whether the Deceased was incompetent when the 1993 will was executed. The jury answered the first question with a no. The second question asked whether a confidential relationship existed between Defendant and the Deceased on or before the date the 1993 will was executed and the jury answered yes. The third question asked whether the Deceased was unduly influenced to execute the 1993 will. The jury answered yes to the third question. The Defendant moved to strike the third question and answer on the ground that the question did not address whether Defendant was the party who unduly influenced the Deceased and, therefore, the

verdict was "ambiguous and uncertain and not sufficient to be the basis of a final judgment in this matter." The Trial Court granted Defendant's motion and struck the answer to question three. Judgment then was entered on March 18, 2003, holding that the Deceased was competent to execute the 1993 will, that a confidential relationship existed between Defendant and the Deceased on or before the date of the execution of the 1993 will, and that based upon the jury's answers to questions one and two, the 1993 will was declared not to be the last will and testament of the Deceased. Defendant filed a motion for new trial, which the Trial Court denied. Defendant appeals to this Court.

## **Discussion**

Although not stated exactly as such, Defendant essentially raises four issues on appeal: 1) whether the Trial Court erred by allowing the introduction of testimony regarding Defendant's alleged racial prejudice; 2) whether the Trial Court erred by failing to declare a mistrial after Plaintiffs' counsel made reference to Defendant's alleged sexual misconduct; 3) whether there was material evidence to support the jury's special verdicts of confidential relationship and undue influence; and 4) whether the Trial Court erred in denying the objection to the entry of judgment. Plaintiffs raise as an additional issue whether it was error for the Trial Court to strike special interrogatory number three and the jury's answer to that question.

We begin by considering whether the Trial Court erred by allowing the introduction of testimony regarding Defendant's alleged racial prejudice. Issues regarding admission of evidence in Tennessee are reviewed for abuse of discretion. *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001). "[T]rial courts are accorded a wide degree of latitude in their determination of whether to admit or exclude evidence, even if such evidence would be relevant." *Id.* Our Supreme Court discussed the abuse of discretion standard in *Eldridge v. Eldridge*, stating:

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

Appellate courts ordinarily permit discretionary decisions to stand when reasonable judicial minds can differ concerning their soundness. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999). A trial court's discretionary decision must take into account applicable law and be consistent with the facts before the court. *Id.* When reviewing a discretionary decision by the trial court, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision." *Id.*

Evidence regarding Defendant's alleged racial prejudice first arose during the trial when Plaintiff Marjorie Delapp testified that Defendant would make racist jokes around her adopted minority children. Ms. Delapp also testified that Defendant would brag about how when he lived in Florida he would pick up "little black boys on the road" who were hitchhiking and scare them by "flying down the highway . . . past the stop where they were supposed to let them out." No objection to this line of questioning was made when this testimony was given.

Later in the trial, Ms. Delapp's ex-husband, Steve Delapp, testified regarding the racial prejudice of Defendant and a brother. An objection based upon relevance was raised at that time. The Trial Court overruled the objection holding the testimony was relevant to proving undue influence by showing that Defendant discouraged or prevented Plaintiff Marjorie Delapp from having contact with her mother.

As far as the story about Defendant's scaring "little black boys on the road" in Florida, no objection was raised to this line of questioning until quite late in the trial when Plaintiff Mary Sherrod was questioned regarding this subject. At that point, the Trial Court overruled the objection noting that it was too late to object to this line of questioning based upon relevance as the subject already had been introduced through other testimony.

We believe reasonable minds could disagree as to the propriety of the decision made by the Trial Court to admit the testimony regarding Defendant's alleged racial prejudice, the very essence of a discretionary decision. We believe this to be especially so given that the testimony regarding racist jokes made around Ms. Delapp's adopted minority children arguably was relevant to the issue of undue influence and that no objection was raised to this testimony or the testimony regarding "little black boys on the road" in Florida when it first was introduced. The Trial Court believed this evidence was relevant to proving undue influence by showing that Defendant discouraged or prevented Ms. Delapp from having contact with the Deceased. We also note that it goes to the Defendant's credibility as he denied ever saying anything negative about Ms. Delapp's children. Given this, we will not substitute our judgment for that of the Trial Court, and we find no abuse of discretion regarding the admission of the testimony regarding Defendant's alleged racial prejudice.

We next consider whether the Trial Court erred by failing to declare a mistrial after Plaintiffs' counsel made reference to alleged sexual misconduct by Defendant. During the cross-examination of Defendant, Plaintiffs' counsel asked "[w]ell, Margie wouldn't want to be around you with her small daughter since you sexually molested her, would she?" An objection was immediately raised and a mistrial requested. The Trial Court sustained the objection and reminded the jury of instructions given at the beginning of the trial stating:

> Ladies and gentlemen of the jury, you remember I talked a lot - - said a lot of things when we first started the trial, but one of the things that I said was a question is not proof. Anybody can ask a question about anything. It's not proof. It's not evidence of anything.

The last question that was asked, I want you to disregard it.

The Trial Court then polled each juror individually asking if each could disregard or ignore the question. Each juror replied he or she could.

"The decision of whether to grant a mistrial is within the sound discretion of the trial court. This Court will not disturb that decision absent a finding of an abuse of discretion." *State v. Dellinger*, 79 S.W.3d 458, 494 (Tenn. 2002) (citations omitted). We believe reasonable minds could disagree as to the propriety of the decision made by the Trial Court not to grant a mistrial, again the very essence of a discretionary decision, especially since the Trial Court gave a curative instruction and polled the jury. We, therefore, will not substitute our judgment for that of the Trial Court, and we find no abuse of discretion regarding the Trial Court's decision not to grant a mistrial after Plaintiffs' counsel made reference to alleged sexual misconduct on the part of Defendant.

We next will consider whether there was material evidence to support the jury's special verdicts of confidential relationship and undue influence. "Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d). As our Supreme Court has explained:

> It is the time honored rule in this State that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict; and in determining whether there is material evidence to support the verdict, the appellate court is required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury.

*Crabtree Masonry Co., Inc. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978).

This Court defined a confidential relationship in *Bills v. Lindsay* stating:

> A confidential relationship is "that relationship where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with the ability, because of that confidence, to influence and exercise dominion over the weaker or dominated party."

> A normal relationship between a mentally competent parent and an adult child is not per se a confidential relationship and it raises no presumption of invalidity of the transaction.

*Bills v. Lindsay*, 909 S.W.2d 434, 440 (Tenn. Ct. App. 1993) (quoting *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973)).

It is well settled in Tennessee "that the existence of a confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises, that may be rebutted only by clear and convincing evidence of the fairness of the transaction." *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995). However, as this Court discussed in *In re: Estate of Maddox*:

> Proof of the existence of a confidential relationship, by itself, will not be sufficient to invalidate a will. It is not the relationship that concerns the courts but rather the abuse of the relationship. Proof of the existence of a confidential relationship must be coupled with evidence of one or more other suspicious circumstances that give rise to a presumption of undue influence.

*In re: Estate of Maddox*, 60 S.W.3d 84, 89 (Tenn. Ct. App. 2001) (citations omitted).

It is rare to find direct evidence of undue influence. *Id*. at 88. Usually, to prove undue influence, one "must prove the existence of suspicious circumstances warranting the conclusion that the person allegedly influenced did not act freely and independently." *Id*. "The suspicious circumstances most frequently relied upon to establish undue influence are: (1) the existence of a confidential relationship between the testator and the beneficiary, (2) the testator's physical or mental deterioration, and (3) the beneficiary's active involvement in procuring the will." *Id*. at 89. Some other recognized suspicious circumstances are:

> (1) secrecy concerning the will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the will; (4) the testator's illiteracy or blindness; (5) the unjust or unnatural nature of the will's terms; (6) the testator being in an emotionally distraught state; (7) discrepancies between the will and the testator's expressed intentions; and (8) fraud or duress directed toward the testator.

*Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989). "The courts have refrained from prescribing the type or number of suspicious circumstances that will warrant invalidating a will on the grounds of undue influence." *Id*.

In this case, the jury found that a confidential relationship existed between Defendant and the Deceased on or before the date the 1993 will was executed. The jury heard testimony on this issue including, among other things, the fact that Defendant lived next door to the Deceased and farmed the Deceased's land. They also heard that the Deceased signed a document that gave Defendant power of attorney. Further, the evidence showed that in 1992, prior to the execution of the 1993 will, the Deceased added Defendant's name to her checking account giving Defendant joint rights of survivorship. Evidence showed that Defendant did write checks on the Deceased's checking account. The evidence also showed that in 1992 or 1993, Defendant sold the Deceased's tractor, got $5,000 for it and did not put the money in the Deceased's account. Taking the strongest legitimate view of all the evidence in favor of the verdict, assuming the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and discarding all evidence to the contrary, as we must, we find there was material evidence to support the jury's verdict. We, therefore, must and do affirm the jury verdict that a confidential relationship existed between Defendant and the Deceased on or before the date the 1993 will was executed.

Defendant also argues there was no material evidence to support the jury's verdict of undue influence. However, the jury heard testimony that Defendant accompanied the Deceased and Ms. Copeland to Attorney Holbrook's office the day the will was signed and that Defendant drove the Deceased to that meeting. They also heard testimony that Defendant was given a copy of the will to review prior to execution. The evidence further showed that the Deceased told several of her children she was planning for the farm to be divided among all her children. The jury heard testimony that several of the Deceased's children were unaware of the existence of the 1993 will prior to the Deceased's death. The jury also heard that in the early 1990's, Defendant started taking the Deceased to have her taxes prepared by H&R Block, which is where he had his prepared. The evidence also showed that Defendant started getting the Deceased's mail because the Deceased was unable to walk down to the mailbox anymore. Finally, several witnesses testified they noticed a decline in the Deceased's mental status in the early 1990's. The jury was entitled to find the evidence presented in favor of Plaintiffs more credible than the evidence presented by Defendant, and clearly they did so. Taking the strongest legitimate view of all the evidence in favor of the verdict, assuming the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and discarding all evidence to the contrary, as we must, we find there was material evidence to support the jury's verdict. We, therefore, must and do affirm the jury verdict of undue influence.

Finally, we consider whether the Trial Court erred in denying the objection to the entry of judgment. Along with this issue must be considered the Plaintiffs' issue as to whether the Trial Court erred in striking the jury's answer to the third interrogatory. The Trial Court granted Defendant's motion to strike the jury's answer to the third question on the ground that the question did not address whether Defendant was the party who unduly influenced the Deceased. Judgment then was entered based upon the jury's answers to questions one and two and the evidence presented to the jury and the Trial Court. The jury was not asked to give a general verdict, and did not do so. Defendant argues that the legal conclusion made by the Trial Court in declaring that the 1993 will was not the Deceased's last will and testament was based solely upon a finding of confidential

-12-

relationship without a finding of undue influence and "cannot stand, as a matter of law." We disagree. We believe it is clear from the Trial Court's judgment that it took the jury's verdict on the first two interrogatories and then considered all the evidence presented at trial in arriving at its judgment. There was a confidential relationship as found by the jury and that determination is supported by material evidence. There was additional evidence of one or more suspicious circumstances that gave rise to a presumption of undue influence by the Defendant. It is clear from the Trial Court's judgment that it found that the Defendant failed to meet his burden of rebutting this presumption of undue influence by clear and convincing evidence. We find no error by the Trial Court on this issue.

Additionally, the Trial Court erred in striking the jury's answer to question three. Undue influence does not need to be exercised directly by the donee. *Estate of Alline Elizabeth Glasgow v. Whittum*, 106 S.W.3d 25, 31 (Tenn. Ct. App. 2002). As this Court discussed in *Estate of Glasgow*:

> It is immaterial whether undue influence is exercised directly or indirectly. In determining whether undue influence is present, a central focus is on the means used and the effect upon the donor. The underlying theory of the doctrine is that the donor is induced by various means to execute an instrument that, in reality, is the will of another substituted for that of the donor. We specifically reject the contention that a beneficiary must be the one who exerts the undue influence.

*Id*. (quoting *Montoya v. Torres*, 823 P.2d 905, 909-10 (N.M. 1991) (citations omitted)).

Thus, the Trial Court erred when it struck the jury's answer to question three. The jury's answer to question three should have been considered. "[I]f the Trial Judge reached the right result for the wrong reason, there is no reversible error." *Shutt v. Blount*, 249 S.W.2d 904, 907 (Tenn. 1952). Given the Trial Court's own implicit finding concerning undue influence by the Defendant and the jury's findings of confidential relationship and undue influence, both supported by material evidence, we hold the Trial Court reached the right result in denying the objection to the entry of judgment. Given our holdings, we find the verdict of the jury was not based on improper passion, prejudice, and misconduct of Plaintiffs' counsel and was supported by material evidence. We, therefore, affirm the Trial Court's judgment that the 1993 will was not the Deceased's last will and testament.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Arthur David Pratt, and his surety.

_____

D. MICHAEL SWINEY, JUDGE