FILED
03/07/2019
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 18, 2018 Session

**IN RE ESTATE OF CHARLES E. CALDWELL**

**Appeal from the Circuit Court for Bradley County**
**No. V-15-396      J. Michael Sharp, Judge**

_____

**No. E2017-02297-COA-R3-CV**
_____

This appeal involves a will contest. The decedent's son alleges that his father "was of unsound mind, without sufficient degree of mental capacity and/or was mentally incompetent to make a valid will" and "was unduly influenced . . . in all circumstances surrounding and including the execution of the purported Last Will and Testament" by his daughter. The trial court found that the decedent had the requisite testamentary capacity to execute the November 2012 will, no confidential relationship existed between the Decedent and his daughter that triggered a presumption of undue influence, and the will was not a product of undue influence. The trial court further found that, in the alternative, the daughter rebutted any presumption of undue influence. The plaintiff appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KENNY ARMSTRONG, JJ., joined.

Joshua H. Jenne, Cleveland, Tennessee, for the appellant, Eddie Dean Caldwell.

Ginger W. Buchanan, Cleveland, Tennessee, for the appellee, Maxie Merlene Jones.

**OPINION**

**I. BACKGROUND**

Charles Edwin Caldwell ("Decedent"), born on July 5, 1928, executed a will on November 5, 2012, ("the November 2012 Will") that is the subject of this appeal. The

November 2012 Will bequeathed his personal and real property to his daughter, Maxie Merlene Jones ("Daughter").

Decedent was married to Juanita Caldwell ("Wife") from 1961 until her death in January 2003. Decedent and Wife had one child during their marriage, Eddie Dean Caldwell ("Son"). Before this marriage, however, Decedent fathered a child with Tommie Millard, who was married to Tom Millard. Because of the sensitive matter of the nature of her birth, Daughter did not know that she was Decedent's biological daughter until 1993 when she was approximately 35 years old; until this time, she believed Mr. Millard was her father. Out of love and respect for Mr. Millard, the man who raised her, Daughter chose not to inform Mr. Millard about Decedent. Son, raised as the only child of Decedent and Wife, likewise did not learn that Daughter was his half-sister until after the deaths of Mr. Millard and Wife, at which time Daughter and Decedent began to have a relationship as father and child. As of 2008, Daughter began frequently visiting Decedent at his home, driving him to various medical appointments and picking up his prescriptions. Son and Daughter also began to have a sibling relationship. The two played pool together on numerous occasions. Testimony revealed that it seemed as if Daughter was always a part of the family.

Decedent's brother had lost his life in an accident, and one of the children who survived the brother, Timothy Caldwell ("Nephew"), moved onto Decedent's property and lived in a trailer on the outskirts of the farm at 1652 No Pone Road, Decedent's family homeplace. Decedent's first will, executed in September 1999 ("the September 1999 Will") included both Son and Nephew as beneficiaries.[1] Other beneficiaries included Wife and Decedent's remaining nieces and nephews; Daughter, unacknowledged at the time, was not listed as a beneficiary. Although there was testimony regarding the existence of other wills between the September 1999 Will and the November 2012 Will, Son, as well as Daughter, had conversations with Decedent about the need for a new will.

In late September or early October 2012, Decedent experienced a medical episode that was later determined to be a stroke. Decedent apparently suffered a similar episode in August 2012. Decedent was discharged from the hospital on October 5, 2012. At this time, Son lived with his father at the family farm. Daughter also visited many times a week. Both Daughter and Son were caretakers to Decedent during his recovery. Son worked nights and would care for Decedent and do farm work during the day, while Daughter stopped at the residence to clean and cook meals for Decedent on her way to her home from her job. As a result of the stroke, Decedent suffered some physical impairments: his speech was slowed and the use of his right arm and hand was debilitated. Decedent's speech eventually improved, but he did not regain full use of his

---

[1]Son testified that he helped Decedent maintain the 120 acres of farm property and the cattle operation.

right hand before his death. Decedent placed Daughter's name on his bank account in order that she could write checks on his behalf.

Both before and after the strokes, Decedent was regarded as a person with independent will who could talk to anyone like an old friend. As a result, Decedent spoke with several persons about his intentions regarding the disposition of his property after his death. The record reveals that Decedent wished to keep the property on No Pone Road in the family and wanted Son and Nephew to always have a place to live. Decedent also desired to make amends of sorts to Daughter for not playing a role in the first 35 years of her life.

On November 5, 2012, Decedent executed the November 2012 Will, the subject of this suit, in which he bequeathed his property to Daughter and disinherited Son. During the same appointment, Decedent also executed a durable power of attorney in which Daughter was named attorney-in-fact. Daughter scheduled the appointment for Decedent and drove him to the initial meeting with Andrew Morgan, the attorney who drafted the November 2012 Will. Mr. Morgan interviewed Decedent in private regarding the nature and extent of his property and to ascertain his intentions and desire for the property upon his death. In his testimony, Mr. Morgan acknowledged that Decedent's speech was slowed to a point where the interview took longer than usual. Despite the slowness of the responses, however, Mr. Morgan observed that their content and quality raised no concerns about Decedent's mental capacity. Daughter was not present for this part of the interview. The November 2012 Will was witnessed by Athena Pendergrass and an additional employee of Mr. Morgan's firm and notarized during the same appointment. Twenty-three days later, Mr. Morgan prepared a letter for Decedent and Daughter to obtain additional signatures from witnesses who would attest that Decedent was competent. Daughter kept the letter and the November 2012 Will at her house.

Decedent subsequently returned to Mr. Morgan on various occasions. In January 2013, Mr. Morgan created a quitclaim deed for 1652 No Pone Road by which Decedent deeded his interest in his property to Daughter. Later, Decedent visited Mr. Morgan for advice on how to reinstate his right to own a firearm. Nothing in these interviews gave Mr. Morgan any cause to be concerned about Decedent's mental capacity.

Following the death of Decedent on April 6, 2015, Son initially submitted for probate the September 1999 Will and was appointed Personal Representative and granted Letters Testamentary. Son immediately initiated suit against Daughter in which he cited causes of action predicated on conversion, fraud, misrepresentation and deceit, unjust enrichment, and breach of fiduciary duty. He sought punitive damages and injunctive relief, and an *ex parte* restraining order to prohibit Daughter from taking any action involving the estate's assets was entered the same day. Daughter, upon being served with process in the aforementioned suit, submitted the November 2012 Will for probate and was designated Personal Representative. Shortly thereafter, Son commenced this action

to contest the November 2012 Will. After a three-day non-jury trial held on August 22-24, 2017, the trial court found that Decedent had requisite testamentary capacity and that the November 2012 Will was not a product of undue influence. Appellant filed a timely appeal.

## II. ISSUES

We consolidate and restate the issues raised on appeal by Son as follows:

A. Whether the Decedent possessed the requisite testamentary capacity to execute the November 2012 Will;

B. Whether there existed a confidential relationship between Decedent and Daughter;

C. Whether the November 2012 Will was the product of undue influence; and

D. Whether the trial court erred in using a clear and convincing evidence standard in regard to its finding of no confidential relationship.

## III. STANDARD OF REVIEW

In this will contest case tried without a jury, we review the record in regard to the trial court's determinations of facts *de novo* with a presumption of correctness, unless the evidence preponderates to the contrary. Tenn. R. App. P. 13(d); *In re Estate of Price*, 273 S.W.3d 113, 119 (Tenn. Ct. App. 2008). The trial court's conclusions of law, however, are subject to *de novo* review with no presumption of correctness. *Id.* Additionally, "[w]hen a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings." *Id.* (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV. DISCUSSION

### A.

We have had numerous occasions to address the issues inherent in a lack of testamentary capacity. Our Supreme Court has concisely stated the following in regard to

testamentary capacity:

> In a will contest, a properly executed will may be challenged on a theory that the decedent's mind was not "sufficiently sound to enable him or her to know and understand the force and consequence of the act of making the will" at the time the will was executed. *In re Estate of Elam*, 738 S.W.2d 169, 171-72 (Tenn. 1987). As this Court has said:
>
>> The testator must have an intelligent consciousness of the nature and effect of the act, a knowledge of the property possessed and an understanding of the disposition to be made. While evidence regarding factors such as physical weakness or disease, old age, blunt perception or failing mind and memory is admissible on the issue of testamentary capacity, it is not conclusive and the testator is not thereby rendered incompetent if her mind is sufficiently sound to enable her to know and understand what she is doing. *Id.* (citations omitted).

*Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002) (quoting *In re Estate of Elam*, 738 S.W.2d 169, 171-72 (Tenn. 1987)).

The trial court made similar observations, citing *In re Estate of Elam* and *In re Estate of Smallman*, 398 S.W.3d 134 (Tenn. 2013):

> The law requires that the testator's mind, at the time the will is executed, . . . be sufficiently sound to enable him or her to know and understand the force and consequence of the act of making the will. The testator must have an intelligent consciousness of the nature and effort of the act, a knowledge of the property possessed and an understanding of the disposition to be made.
>
> A will may be challenged on the theory that at the time of the will's execution the testator lacked sufficient mental capacity. It is . . . the time of the will's execution that is the proper point of focus in assessing testamentary capacity. While proof of a testator's mental capacity before and after making the will, if not too remote in point of time may be received as bearing upon that question [of testamentary capacity,]" the mental condition of the testator at the very time of executing

the will is the only point of inquiry. While evidence regarding factors such as… failing mind and memory is admissible on the issue of testamentary capacity, it is not conclusive and the testator is not thereby rendered incompetent if her mind is sufficiently sound to enable her to know and understand what she is doing.

(Internal citations omitted.).

In the instant case, there was significant testimony at trial about the competence of Decedent both before and after the strokes he suffered approximately a month before the execution of the November 2012 Will. Of the twenty-three witnesses, only Son questioned the competence of Decedent. The remaining witnesses testified that Decedent was competent and of sound mind as well as independent, strong-willed, and prone to speak his mind. Mr. Morgan testified extensively to the best practices he employs when creating a will for a client. As to Decedent, Mr. Morgan interviewed him individually and out of the presence of Daughter for four to five hours throughout multiple visits and confirmed the desires and intentions of Decedent regarding his estate, even his decision to omit Son as a beneficiary. In its final order, the trial court noted the following regarding Mr. Morgan's testimony:

> [Decedent] discussed why he was leaving his son Eddie out of his will. [Decedent] specifically talked about Eddie and his prior legal troubles. [Decedent] informed Mr. Morgan about the monies he had to spend on behalf of Eddie to pay for his legal fees, fines, child support arrearages, as well as other legal related expenses that Eddie had accrued. Mr. Morgan questioned [Decedent] about not leaving anything to his son Eddie, and [Decedent]'s answer was always the same. [Decedent] stated that he had taken care of Eddie's legal problems, and the money he had paid on Eddie's behalf was, in his opinion, enough. . . . [Decedent] informed Mr. Morgan that he was worried that his son, Eddie, might get the real estate and sell it due to his outstanding legal issues and/or his lifestyle issues. [Decedent] wanted to be sure that his real estate was not used to pay for Eddie's indebtedness and his financial habits and/or financial instability. Because of these concerns, [Decedent] wanted to put the farm in his daughter's name. Furthermore, [Decedent] informed Mr. Morgan that he wanted to be sure that his daughter was taken care of. The court finds Andrew Morgan to be a very credible witness.

Further, Mr. Morgan testified that Decedent knew the extent of his real property.

Specifically, Mr. Morgan confirmed Decedent's oral statements, without reference to any notes, that his real property was a very specific number of acres. Furthermore, both Mr. Morgan and Ms. Pendergrass, a witness to the will, testified that Decedent was of the required mental capacity and of sound mind during the execution of the November 2012 Will.

The evidence in the record on appeal shows that Decedent suffered at least one stroke within two to three months before the execution of the November 2012 Will. However, the record also reveals that the strokes suffered by Decedent did not cause him to suffer any significant diminishment of mental capacity. Although the record indicates that Decedent suffered some physical impairments after the strokes prior to his execution of the November 2012 Will, the necessary inquiry is whether any impairments affected Decedent's mental capacity. According to the testimony of twenty-two witnesses, Decedent did not suffer any noticeable loss of mental capacity due to the strokes. It is noteworthy that Decedent made a quick recovery with only minor impairments to his speech and arm movements and continued his work on the farm shortly after the strokes.

Son also advances the argument that his father's dementia diagnosis disqualifies Decedent from having the capacity to execute a will. However, most of the instances of questionable mental state shown in the record were too remote in time to be dispositive of the issues in this case. Our inquiry requires that "the mental condition of the testator at the very time of executing the will [be] the only point of inquiry." *In re Estate of Smallman*, 398 S.W.3d at 159. Further, Son contends that the trial court should have relied on the expert testimony of Dr. Luther Frank Chandler, an internal medicine physician whose opinion regarding Decedent was based solely on a review of medical records. Despite the trial court admitting the deposition testimony of Dr. Chandler into evidence, it gave it little, if any, weight. We defer to the trial court's determination of credibility and weight given to this evidence.

Based on the testimony of Mr. Morgan, Ms. Pendergrass, and a host of other witnesses, we find that a preponderance of the evidence supports the trial court's determination that Decedent was of sound mind and had the required mental capacity to execute the November 2012 Will.

### B. & C.

We now turn to the primary inquiry at trial: whether the November 2012 Will was a product of undue influence. A will may be invalidated when that will was a product of undue influence. As our Supreme Court has explained:

> [A] will may be challenged on the basis that the decedent was subject to the undue influence of another in executing the

will. In Tennessee, for example, where there is a "confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises, that may be rebutted only by clear and convincing evidence of the fairness of the transaction." *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995) (citations omitted). A confidential relationship is any relationship which gives one person dominion and control over another. *See Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989).

The burden of proof regarding a confidential relationship rests upon the party claiming the existence of such a relationship. *See Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983). Once a confidential relationship has been shown and a presumption of undue influence arises, the burden shifts to the dominant party to rebut the presumption by proving the fairness of the transaction by clear and convincing evidence. *Matlock v. Simpson*, 902 S.W.2d at 386; *see also Gordon v. Thornton*, 584 S.W.2d 655, 658 (Tenn. Ct. App. 1979). To prove the fairness of the transaction, the dominant party may show that the weaker party received independent advice before engaging in the transaction that benefitted the dominant party. *See Hogan v. Cooper*, 619 S.W.2d 516, 519 (Tenn. 1981); *see also Richmond v. Christian*, 555 S.W.2d 105, 107-08 (Tenn. 1977) (proof that the donor received independent advice respecting the consequences and advisability of the gift) (citations omitted).

*Childress*, 74 S.W.3d at 328.

Thus, the first question before us is whether a confidential relationship existed between Decedent and Daughter. As this court explained in *In re Estate of Dukes:*

Confidential relationships can assume a variety of forms, and thus the courts have been hesitant to define precisely what a confidential relationship is. *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974). In general terms, it is any relationship which gives one person dominion and control over another. *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Turner v. Leathers*, 191 Tenn. 292, 298, 232 S.W.2d 269, 271 (1950); *Roberts v. Chase*, 25 Tenn. App.

- 8 -

636, 650, 166 S.W.2d 641, 650 (1942). It is not merely a relationship of mutual trust and confidence, but rather it is one

> where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party.

> *Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989) (quoting *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973)). "A normal relationship between a mentally competent parent and an adult child is not per se a confidential relationship and it raises no presumption of invalidity of the transaction." *Bills v. Lindsay*, 909 S.W.2d 434, 440 (Tenn. Ct. App. 1993).

*In re Estate of Dukes*, No. E2014-01966-COA-R3-CV, 2015 W.L. 5313547 at *12 (Tenn. Ct. App. Sep. 11, 2015). Significant to our review is the fact our Supreme Court has clarified that "[w]hen an unrestricted power of attorney is executed but has not yet been exercised, . . . there exists no dominion and control and therefore no confidential relationship based solely on the existence of the power of attorney." *Childress*, 74 S.W. 3d at 329.

It is well settled that "[p]roof of the existence of a confidential relationship, by itself, will not be sufficient to invalidate a will. It is not the relationship that concerns the courts but rather the abuse of the relationship. Proof of the existence of a confidential relationship must be coupled with evidence of one or more other suspicious circumstances that give rise to a presumption of undue influence." *Delapp v. Pratt*, 152 S.W. 3d 530, 540 (Tenn. Ct. App. 2004) (quoting *In re Estate of Maddox*, 60 S.W.3d 84, 89 (Tenn. Ct. App. 2001) (other citations omitted)). This court further explained:

> The suspicious circumstances most frequently relied upon to establish undue influence are: (1) the existence of a confidential relationship between the testator and the beneficiary, (2) the testator's physical or mental deterioration, and (3) the beneficiary's active involvement in procuring the will. Some other recognized suspicious circumstances are:

> > (1) secrecy concerning the will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the will; (4) the testator's illiteracy

- 9 -

or blindness; (5) the unjust or unnatural nature of the will's terms; (6) the testator being in an emotionally distraught state; (7) discrepancies between the will and the testator's expressed intentions; and (8) fraud or duress directed toward the testator.

The courts have refrained from prescribing the type or number of suspicious circumstances that will warrant invalidating a will on the grounds of undue influence.

*Delapp*, 152 S.W. 3d at 540-41 (citing *In re Estate of Maddox*, 60 S.W. 3d at 89; *Mitchell v. Smith*, 779 S.W.2d at 388 (internal citations omitted).

Therefore, to invalidate a will based on undue influence, the contestant of a will is required to prove, by a preponderance of the evidence, the existence of a confidential relationship that was surrounded by suspicious circumstances. *See Delapp*, 152 S.W. 3d at 540-41; *In re Estate of Maddox*, 60 S.W. 3d at 89. Thus, Son must show that a confidential relationship existed between Decedent and Daughter and that suspicious circumstances surrounded this relationship. Son does in fact contend that this confidential relationship existed.

The record before us does not reveal such suspicious circumstances as existed in the cases relied upon by Son. Both Daughter and Son were caretakers of Decedent after he was treated for a stroke. Decedent made a quick recovery and was able to continue his duties on the farm and, by all accounts, was once again independent. Son has not established that Daughter had opportunities to sequester Decedent in order to exert dominion and control over him.

Although Daughter had some hand in procuring the appointment for the creation of the November 2012 Will, her role appears limited to making the appointment and driving Decedent to the office of Mr. Morgan. Daughter was not present during the interview Mr. Morgan conducted with Decedent. There was testimony that Decedent attended further appointments, including appointments with Mr. Morgan and unscheduled appointments with the Register of Deeds, without Daughter. Despite a durable power of attorney being executed which named Daughter as the attorney-in-fact on the same date as the November 2012 Will, the record reveals that this power of attorney was never exercised. Daughter instead relied on the express permission of Decedent to write checks on the account to which Decedent had added Daughter's name.

Son contends that Daughter kept the November 2012 Will secret. However, there was testimony that Son along with Daughter discussed with Decedent about obtaining a

- 10 -

new will.[2]  Further, the record reflects that Daughter and Son had at least one conversation in the presence of Decedent in which they discussed, or at the very least alluded to, the existence of the November 2012 Will.  Additionally, the fact that Daughter possessed the November 2012 Will and that it was not kept in Decedent's safe is not dispositive under the facts of this case, as both Daughter and Son testified that the combination to the safe in which Decedent kept his important papers remained the generic default combination that was possibly shared among family members.

In our view, a preponderance of the evidence supports the determination of the trial court that Son has not advanced a combination of suspicious circumstances that would sustain a finding of a confidential relationship between Decedent and Daughter. The relationship between the two was that of an elderly parent and an adult child.  The relationships between family members and relatives are not by themselves confidential relationships. *Mitchell*, 779 S.W.2d at 389 (citing *Halle v. Summerfield*, 287 S.W.2d 57, 61 (Tenn. 1956)).

Additionally, the November 2012 Will is not inconsistent with the intention of the Decedent to treat his children equally.  There is ample evidence that Decedent regretted not having any relationship with Daughter until she was 35 years of age and wanted to do right by her.  Whereas Decedent provided Son with financial help on numerous occasions, there is very little on the record where Decedent provided Daughter with anything other than naming her the beneficiary under the will and the 2013 quitclaim deed.  There is also evidence that Decedent wished to keep the farm in the family where Son and Nephew would always have a place to live.  As the trial court held in its final order:

> The court finds that [Decedent] had a great deal of trust and confidence in the defendant [Daughter]. . . .  [Decedent] believed that his son still owed a great deal of money for his back child support obligation that he had not paid, and he was concerned that Eddie would sell some or all of the farm to pay his child support arrearage. . . . [Decedent] also believed that his son Eddie owed a great deal of money to the IRS for back taxes.  Ultimately, [Decedent] did not believe that Eddie would be able to keep the farm, nor would he be able to pay for the maintenance and upkeep of the farm.  Because of this, [Decedent] believed that Eddie would simply sell the farm.

Indeed, Son admitted in his testimony and to others that the farm was his "retirement

---

[2] Interestingly, Son admits in his testimony to the existence of wills other than the September 1999 Will that Son submitted for probate.  Specifically, Son testified to two other wills but failed to produce proof of the wills at trial.

plan." Leaving the property to Daughter, apparently the only one in the family with resources to pay the taxes, is consistent with Decedent's desire for the farm.

The testimony of Mr. Morgan, the attorney who prepared the November 2012 Will, is noteworthy on this issue:

> I point blank asked [Decedent] why he intended to leave such a disparate amount, the way he was leaving it, and he said that Eddie had gotten in some trouble years ago and he spent a lot of money trying to get Eddie out of it – out of the trouble, that is – and he just wanted to do right by Maxie. And I, of course, asked him, you know, has she – I don't remember the words I used but I effectively asked if she had been influencing him in some way and he assured me that she had not.

The trial court determined that no confidential relationship involving dominion and control existed between Decedent and Daughter and, therefore, no presumption of undue influence arose. In the alternative, the trial court held that, even if the presumption arose, Daughter rebutted the presumption with clear and convincing evidence that Decedent received independent advice. *See In re Estate of Maddox*, 60 S.W.3d at 89. We defer to the trial court's credibility determinations based upon observation of the witnesses at trial. The evidence, particularly Mr. Morgan's and Ms. Pendergrass's testimony, supports the determination of the trial court that no confidential relationship existed between Decedent and Daughter.

### D.

The trial court announced that the burden of proof in this matter was by "clear and convincing evidence." Son contends, and Daughter agrees, that the trial court erred in this statement and that the correct standard to prove the existence of a confidential relationship is by a preponderance of the evidence. We agree that the court's statement was in error. However, after reviewing the record *de novo,* with a presumption of correctness in regard to findings of fact, we find that the error was harmless and the record, in its entirety, supports the trial court's decision in accordance with the preponderance of the evidence standard.

### V. CONCLUSION

For the reasons stated above, we affirm the decision of the trial court. The case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Eddie Dean Caldwell.

_____
JOHN W. MCCLARTY, JUDGE