# IN THE COURT OF APPEALS OF TENNESSEE
# AT KNOXVILLE
June 30, 2015 Session

## IN RE: THE ESTATE OF DOYLE I. DUKES

**Appeal from the Circuit Court for Union County**
**No. 3078     John McAfee, Judge**

---

**No. E2014-01966-COA-R3-CV – Filed September 11, 2015**

---

Doyle E. Dukes ("Doyle E.")[1] filed a petition for letters testamentary in the Chancery Court for Union County seeking to have the Last Will and Testament ("the Will") of Doyle I. Dukes ("Deceased") admitted to probate. Melbia Cooke ("Melbia"), Mary Lou Anderson ("Mary Lou"), and Ruth Jerline Hickey filed a complaint to contest the Will. The case was transferred from the Chancery Court for Union County to the Circuit Court for Union County ("the Trial Court"). After a bench trial, the Trial Court entered its order on September 19, 2014 finding and holding, *inter alia*, that a confidential relationship existed between Deceased and Doyle E., that the Will was invalid as the product of undue influence, and that Deceased died intestate. Doyle E. appeals to this Court raising issues regarding whether the Trial Court erred in finding a confidential relationship and whether the Trial Court erred in finding undue influence. We find and hold that the evidence in the record on appeal does not preponderate against the Trial Court's findings, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J. M.S. and JOHN W. MCCLARTY, J., joined.

Bill W. Petty and Micha Buffington, Knoxville, Tennessee, for the appellant, Doyle Edward Dukes.

Salvatore W. Varsalona, Clinton, Tennessee, and Wendell K. Hall, Knoxville, Tennessee, for the appellees, Melbia Cooke, Mary Lou Anderson, and Ruth Hickey.

---

[1] We refer in this Opinion to several of the parties by their first name for ease of reading only, with no disrespect intended.

# OPINION

## Background

Deceased died in February of 2009 at the age of 91. Deceased was a resident of Union County, Tennessee at the time of his death. Deceased was married twice during his lifetime and had four children with his first wife and three with his second. Deceased's second wife and one of the children from his first marriage predeceased him. Ruth Jerline Hickey, Marguerite Owens, David A. Dukes, and Donald Alden Dukes[2] were the children born of Deceased's first marriage. Doyle E. Dukes, Mary Lou Anderson, and Melbia Cooke are the adult children born of Deceased's second marriage. None of Deceased's children were minors at the time of Deceased's death.

Doyle E. filed a Petition for Letters Testamentary in March 2009 seeking to have the Will, which had been executed in December of 2007, admitted to probate. In pertinent part, the Will provided bequests of $1,000 to each of the following of Deceased's children, Jeraline[3] Hickey, Melbia Cook[4], Mary Lou Anderson, Marguerite Owens, and David A. Dukes. The Will stated that Deceased had considered the children of his deceased child Donald Alden Dukes and specifically omitted them from a share of his estate. The rest, residue, and remainder of Deceased's estate was bequeathed in the Will to Doyle Edward Dukes. Two months after the Will was executed Deceased executed a durable power of attorney giving Doyle E. power of attorney.

David A. Dukes and Marguerite Owens each signed a Receipt of Devisee With Full Release and Statement In Lieu of Final Accounting By Residuary Beneficiary, and neither David Dukes nor Ms. Owens are involved in this suit. David Dukes died during the pendency of this suit. Melbia Cooke, Mary Lou Anderson, and Ruth Jerline Hickey filed their complaint to contest the Will. The case proceeded to trial without a jury in August of 2014.

Mary Lou testified at trial that Deceased owned and operated Gay Jewelry in Knoxville where he repaired watches, sold jewelry, and fixed clocks. He operated the business for approximately 60 years and closed it down in 2006 or 2007. Although she had visited her father's business in the past, Mary Lou had not been in the shop for approximately the last six or seven years before the business was closed. Deceased also owned rental properties containing houses located in Knoxville. Mary Lou testified that her father did not finish the fourth grade, but that he was "street smart" and

---

[2] Donald Alden Dukes predeceased Deceased.

[3] Jerline is misspelled in the Will.

[4] Melbia Cooke's last name was misspelled in the Will.

"mechanically smart." She testified that Deceased could not write a check and could not read, but that he could "make out words, small words, maybe simple common words."

Mary Lou testified that the only time she borrowed money from her parents was in 1972 when she borrowed $100. Mary Lou stated that she paid the loan back by paying $25 per week over four weeks. She testified: "[Deceased] would tell me, he said I love Doyle Edward to death, but I'll tell you what, he will not pay me back a thing he owes. He owes me thousands of dollars that I'll never see a dime of."

Mary Lou testified that Deceased had a stroke in May of 2007. He was in the hospital for approximately one week. When Mary Lou was asked if Deceased had dementia, she stated: "I'm not medically trained, but from all scientific facts of how that, me taking care of my aunt and me seeing other people, yes, I would have most definitely said my dad had dementia."

Mary Lou testified that she went to her father's house in December of 2007 approximately one month after her mother died and several weeks before the Will was executed. She stated that she knocked on the door and got no answer so she opened the unlocked door and entered. Mary Lou stated: "Daddy was sitting in there sound asleep. I opened the door and went in. I had to shake him to wake him up. The TV was just blaring really loud. Daddy had sat there and he had urinated all over himself."

Mary Lou testified that her father: "was old and he was afraid and he was scared and he was unsure. . . . Because he was constantly told them girls are going to push you in a nursing home, them girls, all they want out of you is your money." Mary Lou then stated that she "never took no money off of Daddy and I never took nothing out of his house." Mary Lou testified that Deceased "was afraid not to" rely upon Doyle E.

Mary Lou testified that Doyle E. had power of attorney for Deceased, and she did not know that she had any legal right to take care of her parents. Mary Lou testified that she visited her parents' house approximately once a week for the last five or six years of Deceased's life. Mary Lou testified that Melbia told Doyle E. that she would quit her job and cook and clean for their parents, and Doyle E. told Melbia that she could not do so. Mary Lou testified that in November of 2007 "my brother lit into me and told me that I was going to keep my - - listen here, you blankety-blank-blank, you're not telling me what to do. I'm in charge, I'm in control, and it ain't none of your blank business."

Mary Lou testified: "Daddy didn't have any bills other than possibly property tax, utility bill, maybe his funeral bill. Daddy didn't owe nobody anything." Mary Lou was asked if she ever had conversations with Deceased about his finances, and she stated:

3

The only conversations Daddy ever went on about his finances was -- he just brought it out of the blue -- you girls are going to be so proud. All of you kids are going to be so proud of me. You all don't know what all you all are going to get to go through. Sometimes he would call himself daddy-o. Daddy-o's got every one of you all taken care of.

There was a specific conversation that occurred in 1976, and the reason I remember this is because my ex-husband, Harrell, Melbia and myself was standing upstairs. He had purchased a bicentennial rifle. It had a gold coin in it, and he called Harrell, Melbia's husband, nicknamed Joseph. He said Joseph, he said I want you to have this when something happens to me. He said well, I appreciate that, Doyle. He said why do I get this? He said because you took Lily off my hands, which he referred to my sister Melbia as our grandmother Lily.

So my ex-husband said well, Daddy Dukes, what do I get? He said you don't get anything because you stole Mary Lou.

And over the years and at Christmas, the last Christmas get-together we had we were totally shocked. He put a hundred dollar bill in the Christmas card which I'm sure Doyle Edward did that. It was his writing. And we said Daddy, why did you give us so much? You didn't have to. No, I want you to take it. That's just the beginning. You all are going to have plenty once something happens to me.

He also had always indicated all of his life that everything was to be divided equally among us three.

Mary Lou testified that her father always treated all of his children "the same." Mary Lou did not learn about the existence of the Will until approximately a week after Deceased died.

Deceased owned an assortment of guns. Mary Lou was asked about Doyle E.'s deposition testimony that Deceased gave Doyle E. the guns in the 1990s, and she stated:

I disagree with that, because we were both told by Daddy and Mother that Doyle Edward insisted on taking them out of the house, to take them to his jewelry store to store them in his safe because he was afraid the house might get broken into.

4

The day that Mother was in the hospital Doyle Edward sat out in the waiting room. He brought up the subject and said well, I'll tell you how we're going to do this when something happens to Daddy. He won't live a month after Mother passes away. I said you don't know how long Daddy will live. Well, what we'll do is we're going to get tags like raffle ticket tags. We'll tag all the guns and all the clocks and we'll throw all the numbers in a fishbowl or a bowl, we'll draw them out, and whoever draws what is what they'll get.

Melbia testified that her father could not read. She stated: "He always told us he had like a third grade education, because he had to quit and help on the farm." Melbia testified that she does not believe that her father could have read the Will.

It was Melbia's understanding that Doyle E. had a power of attorney for Deceased, but she never saw the document. She testified that Doyle E. told Melbia after their mother died that he was in the process of getting someone to come in to help Deceased, and Melbia stated: "if you're going to do that and Daddy knows a rank total stranger, let me do it. I said I'll just quit my job. I said if you're going to pay somebody to do it, I said let me do it. But I didn't have to have the money." Melbia testified that her brother "didn't tell me no. He said H no." She testified that her brother "was in control." Melbia testified that her brother was bringing Deceased food, administering his medications, and handling his finances. When asked, Melbia agreed that Doyle E. was the primary person looking after Deceased. With regard to the daily care of Deceased Melbia stated: "[Doyle E.] done a lot of it. I helped him every time that I could."

Melbia first learned of the existence of the Will approximately one week after they buried Deceased. She stated that Deceased "told me several times, he said I want everything divided equally." Melbia testified that her father always treated all of his children as equals. She stated that when she learned about the Will "it was hurtful, because Daddy had told me one thing and then I - - I was fine with [Doyle E.] being executor because I figured he would do everything fair and equally. I was in shock."

Melbia testified that she had a conversation with Doyle E. about Deceased's guns prior to their mother's death and approximately one month prior to the execution of the Will. She stated:

[Doyle E.] said well, when something happens to Mom or when they're both gone, we'll say when they're both deceased, okay, we'll take everything and we'll divide the guns and the clocks. We'll do all of this equally, but we're not going to do anything. I know where they're at. I know how I'm going to take care of it. I was fine with it.

5

Doyle E. testified that he owns a jewelry store and has been in business for approximately forty-five years.  He learned the trade from his father.

Doyle E. testified that Deceased was 90 years old when he executed the Will. Doyle E. admitted that the Will was executed after Deceased had suffered a stroke and that Deceased also had diabetes.

Doyle E. testified that his parents treated their children equally.  He was asked how he would characterize his relationship with his sisters Mary Lou and Melbia, and he stated: "Good. . . .  Up until a point."  He explained:

Well, that changed when Dad was in the hospital for a surgical procedure [in December of 2008].  He was having a feeding tube put in his stomach. And he had made a will, so I said well, we need to discuss a little something.  I don't know if you know it, but Dad has made a will.

* * *

Mary Lou said I don't want to hear a word you have to say.  We will let our lawyer do the talking for us.  I said now wait a minute, we need to talk about this.  Melbia said you heard what she said.  I said look, I'm trying to explain something to you.  He wanted me to be the administrator and we need to discuss some stuff.  You heard what we said.  Melbia said Daddy didn't have enough sense to make a will and we're not going to listen.  I said you don't need to do - - well, you heard what we said.  I said okay, I won't say another word about it, I won't mention it again, but you're making a mistake.

Doyle E. was asked why Deceased would have excluded his siblings, and he stated: "When [my sisters] had a cookout or anything they would call me and invite me and say don't bring Mother and Daddy because we don't want them in the house."

Doyle E. was asked about a telephone conversation he had with Mary Lou the day after their mother was buried, and he stated:

So the telephone rang.  I answered the phone.  She started out, we're going to have a family meeting and you need to get down here.  He's going somewhere tonight.  We're going to put him somewhere before he ruins all of our lives.  Do you know what he has been into this time? . . .  Well, she was screaming in my ear and she said he's leaving and he's going

6

somewhere tonight before he ruins all of our lives. And I said I already know, I've got it taken care of. The EMTs, the blood sugar got low, I've talked to them, he's at home, everything is fine. No, it's not. We're going to have a family meeting. He's leaving.

I said let me tell you something, he's not going any GD MF'ing place, and I mean it. I'll show you who leaves. You want to have a family meeting? You stay there until I get there and I'll tell you who leaves. Dad is not leaving the house. This is the day after we buried Mother.

Doyle E. was asked if one of his sisters offered to stay with Deceased, and he stated: "Not that I know of." He denied having the conversation with Melbia that she had testified about. Doyle E. testified that he was in the process of fixing up a mobile home for Deceased before Deceased went into the nursing home.

Doyle E. was asked how he chose attorney K. David Myers to draft the Will, and he stated that attorney Jim Humbird recommended him. Doyle E. then was asked why he had testified during his deposition that he selected Mr. Myers because he went to school with him, and he then stated: "That's the reason then." Doyle E. testified that his parents told him they wanted to prepare a will so he called Jim Humbird. Mr. Humbird came to Doyle E.'s shop, and Doyle E. took Mr. Humbird to meet with his parents. Doyle E. testified that while Mr. Humbird spoke with his parents Doyle E. went to the sink and ran the water for a while and then brought Mr. Humbird a glass of water. Mr. Humbird called Doyle E. a few months later and told Doyle E. that he could not prepare a will because he was ill. Mr. Humbird recommended that they get another attorney and made a few suggestions.

Doyle E. testified that after his mother died his father called him and told him to make an appointment so he could make a will. Doyle E. stated: "I called David Myers and made Dad an appointment and took him to see him for the first initial interview." He testified:

So [Mr. Meyers] told me when to bring him up. I brought him up. They went back in the office, sat down and talked. I waited in the lobby. [Mr. Meyers] came out and he said does your dad have a family physician? I said yes, he does. He said well, I've talked to him, I'm going to make him a will. He said I can't see anything wrong with him at all, but he said anybody of his age, he said I always recommend that they get a doctor's statement from a family doctor.

7

Deceased had an appointment already scheduled with his physician at that time, and Doyle E. took him to that appointment. Doyle E. accompanied Deceased into the treatment room during the doctor's appointment and spoke with the doctor who then gave Deceased a note stating that Deceased "is mentally capable of rewriting his will."

Doyle E. testified that Mr. Meyers told him to have Deceased pick out two witnesses. Doyle E. stated that Deceased chose the witnesses. Doyle E. testified that he called the witnesses and allowed Deceased to speak to them, and the witnesses then met Deceased at Mr. Meyers' office on the day the Will was executed.

Horace Damewood and Owen Burnett were the witnesses to the Will. Mr. Burnett died prior to trial. Doyle E. testified that he was 65 years old at the time of trial and that Horace Damewood was around 70 years old and Owen Burnett would have been in his early 70s. When questioned, Doyle E. admitted that the witnesses were closer in age to him than to his father and that both also were clients of his. Doyle E. also admitted that Mr. Damewood's wife worked for him for ten years and that he was friends with Mr. Damewood. Furthermore, Mr. Damewood's wife is the sister of Doyle E.'s girlfriend. Doyle E. and his girlfriend live together and have been together for approximately eleven years. Doyle E. also admitted that he had been friends with Owen Burnett before Mr. Burnett died. Owen Burnett also was a distant family member.

Doyle E. testified that Mr. Burnett took Deceased to the second appointment with Mr. Myers. Doyle E. stated that he went to Mr. Myers's office to pick Deceased up approximately 45 minutes to an hour after Deceased had gone to Mr. Myers's office. Doyle E. testified that he waited in the lobby at Mr. Myers's office until the Will was executed.

After the Will was executed Mr. Myers handed it to Doyle E. and told him to put it in a safe place. Doyle E. was asked if Mr. Myers had tried to hand the Will to Deceased, and he answered "No."

Doyle E. took the Will and had his girlfriend read the Will to "make sure the addresses are right, spelling is correct."[5] Doyle E. testified that he instructed his girlfriend to seal it back up after reading it and to not tell him what was in the Will. Doyle E. testified that he did not read the Will. After his girlfriend sealed up the Will, Doyle E. put the Will into the safe in his store. When questioned about why he wanted his girlfriend to check spelling and addresses when he had stated that he did not know what was in the Will, Doyle E. stated:

---

[5] Interestingly, we note that Doyle E. testified that he had his girlfriend read the Will to check spellings, but that Melbia Cooke's name and Ruth Jerline Hickey's name both are misspelled in the Will.

I didn't know all the contents, but I knew he was going to name all the children. . . . Well, because he said I'm going to leave everybody something, and he tried to talk to me about it. I said hey, whatever you want to do, I'm not going to discuss it. You do what you want to do.

Doyle E. testified that Deceased could read. He was unsure how far Deceased had gone in school, but stated that he "would assume somewhere about the sixth grade." Doyle E. testified that Deceased taught him how to write cursive and that he had seen Deceased write out receipts and checks. He also stated that he had heard Deceased read watchmaker's manuals, and Deceased had taught him how to use a watchmaker's manual.

Doyle E. testified that when he was cleaning out Deceased's business safe he found an older will. He stated that he told Deceased: "Everybody on it is dead here. You might want to redo that or something someday." When asked what he meant by "[e]verybody on it is dead . . .," Doyle E. stated: "Everybody but him and Mother at that time. Well, not the children, but what I meant, all the witnesses and the person that prepared it. And it was not complete." Doyle E. stated that the older will left everything to "My mother. I think it was something like $250 to each child. . . . Including me, I think. Some of the kids were left off. I don't know. Like I said, it wasn't complete. It was like a rough draft." He further stated that each child was given a gun of their choice. Doyle E. stated that the document had witnesses' signatures on it, but not his father's signature. Doyle E. stated during his deposition that he would produce this older will, but he never did. When asked at trial why he had not produced the older will, Doyle E. stated that he thought he had it, but he had been unable to find it.

Doyle E. testified that he saw Deceased about three times a day. Doyle E.'s business was close to Deceased's house. Doyle E. assisted both his parents with paying bills and banking, and his name was on Deceased's checking account. When asked why his name was on his parents' accounts, Doyle E. stated: "It was their idea. Well, I was always closer. I would always put money in the bank, pick up my mother's prescriptions, take her medicine, get my dad's medicine and dose it out to them, so they wanted my name on it." Doyle E. agreed that his parents trusted and relied upon him. He testified that he would take breakfast to his parents every day and then take them lunch. He stated:

But there was a little small restaurant next door to me but they only served lunch, so I would take them breakfast every morning and then I'd take them lunch, but they said well, we throw all this away, we cook it every day, so we'll give you a double plate for whatever you buy.

Doyle E.'s name also was placed on two or three of his parent's CDs. He stated that this "was money that was put in the bank after Dad sold the store." Doyle E. testified that they had netted approximately $150,000 to $175,000 from the sale of Deceased's business. When his parents died, the CDs became Doyle E.'s as the survivor. Doyle E. was asked why he hadn't provided Deceased's bank records for the CDs and the checking accounts as requested, and he stated: "Well, I've got a business to run. I've been swamped with work." Doyle E. was asked if the money from the CDs still was in the bank, and he stated:

> No. Well, I've spent a lot of the money because Dad outlived a lot of the money, so I - - he didn't have a whole lot in the checking account. He had about wiped it out, or it was going to wipe it out to bury him, so I transferred some of the CDs over to his checking account. And my name was on it, and we transferred that out and I paid for the funeral arrangements and stuff.

Doyle E. was asked if he was saying that all of the money was gone, and he stated: "Yes." He stated: "Well, it was used for Dad's health. For five and a half years I've paid city and county property tax, I have put a roof on the house, put a bathroom floor, maintaining the property."

Doyle E. testified that Deceased owned six real properties and that some have houses, but only two of those are livable. Doyle E. testified that the real property upon which Deceased's house sits contains approximately forty-six acres and is located in Union County. Doyle E. testified that when in 2006 or 2007 his father was having difficulty collecting rent on one of his properties, Doyle E. took over the task of collecting rent. Doyle E. evicted the tenants when they did not pay. Doyle E. also oversaw maintenance on the real properties. When asked, Doyle E. agreed that he was taking care of almost everything for his parents, and that they relied upon him.

Doyle E. was asked about Deceased's guns, and he estimated that there are between 250 and 275 guns. He further testified that the guns are worth on average about $200, so the total would be worth approximately $55,000. Doyle E. explained that Deceased kept the guns at his house:

> Pretty much until about 1991 and Mother was getting real sick, you know, having to go to the hospital, back and forth. He said somebody is going to break in here and get these guns. He said let me just give them to you. I said how about calling David? And I talked to David and he said I don't want the things. I can't store them. I said oh, God, okay.

10

So Dad said all right, I'm going to give them to you and take them with you, take possession. I said well, we'll just say they're still yours until you die or whatever.

The guns have been at Doyle E.'s house since 1991. At trial Doyle E. stated that his father had given the guns to him.

Doyle E. testified that after Deceased's death he did an inventory of the things in Deceased's house. He testified that Deceased's house was broken into "[a]t least three" times after he did the inventory. Doyle E. reported each break in to the police. He stated: "I would say there was between 15, $17,000 worth of clocks stolen. There were some that was real valuable and then some that was just average. There was probably 25 clocks, maybe, 20 or 25." There are probably 75 clocks left. After the break-ins, Doyle E. moved the remaining clocks to a storage container. He estimated the ones in storage are worth approximately $25,000.

Doyle E. was asked if Deceased ever mentioned the Will to him again after Doyle E. put it into his safe, and he stated:

He did mention it one other time. That was when he was in the hospital right before he died. . . . It was on the 26th of February in '09. I was at the hospital. And I'll tell you in a minute. I was sitting in the chair and he was laying on his left side and he said come here, son. . . . He said come over here. I said what do you need? He said bend down here and shake my hand. He said don't you turn my hand loose. He said look me in the eye. I said okay. He said I want you to promise me that you're going to carry out my will the way I had it wrote. I said well, I don't really know what's in it. I haven't read it yet. He said I don't care. It don't matter what's in it, I want it carried out the way I had it wrote. He said and you hold my hand, don't you turn it loose. I'm not through talking yet.

He said I put you in charge of everything. He said I left the money to you for a reason. He said you can give them girls extra money, you can divide out, give them property, give them clocks, guns, whatever. But he said if they start a big lawsuit and they show their hay, he said I mean they get nothing and I mean nothing. Do you hear me? You promise me that?

I said Dad. He said I'm telling you, boy, you're looking me in the eye and you're shaking my hand. He said I'm going to tell you something. He said I love them, but they broke my heart.

He said Mary Lou come to the hospital.  She jumped on me when I had a stroke and said she demanded half of that farm and make a deed, and she said I'll have you living in the rescue mission.  I'll show pictures to Mother and I'll get you divorced.  And he said that's not right, that's blackmail.  He said I ain't putting up with it.  I don't care.  I don't have long left to live.  And he said if they start a big lawsuit, I'm telling you, they get nothing.  He said I left you enough money to buy a better lawyer than they can buy and I mean I want you to stick with them.   But now, if they don't start a lawsuit you divide out all of this stuff, and I'm telling you.

He said they have talked hateful to me, they've come over to the house and they've got me upset and he said they've treated me like a mangy dog in an ice cream parlor, and I'm over it.  He said feed my cat until he dies, and that was the last words he said and he died the next day.

And I hate that it happened that way.  That's the way it is and I'm telling the truth.  I can't help it what they think.  I'm sorry, but that's what he said.

Doyle E. was asked if this was the first time he ever told anyone about that conversation, and he stated: "That's correct.  Except to my attorney, Bill Petty."  Doyle E. then was asked why he did not reveal details about that conversation during his deposition, and he stated: "Well, you didn't ask me that question exactly.  You didn't ask me about when he was in the hospital the day before he died."  During his deposition Doyle E. was asked if he had any conversations with Deceased about Deceased's estate.  When this was pointed out at trial to Doyle E., he stated: "I didn't.  It wasn't about his estate.  He brought it up.  He did the talking.  So I listened.  What my dad wanted was confidential.  I honored his wishes."  The following exchanged then occurred:

THE COURT:  That's not what he's asking you.  You're pretty adamant today about what your dad wanted.  He's saying that he had asked you in your deposition - - when was the deposition taken?

MR. VARSALONA:  The deposition was taken August the 4th.

THE COURT:  That's going to be attached as Exhibit 10 for identification purposes.  We can look at that.  So in the deposition you never provided that information, what your dad said?

[DOYLE E.]:  No, I did not.

MR. VARSALONA:  What did you say, Your Honor?  I'm sorry.

THE COURT:  He never gave you that information in the deposition.  Does that seem like a big deal to you?  It seems like a big deal to me, for whatever that's worth.  I don't know that your dad is telling you right before he dies, the day before he dies he's left everything to you.

[DOYLE E.]:  Well, he said I put you in charge, is what he said.  And he said if they don't start a big lawsuit - -

THE COURT:  You told me a while ago he left all the money to you and - -

[DOYLE E.]:  Well, he left all the money - -

THE COURT:  And what I gathered from that was if you want to give your sisters something give it to them, but they've been mean to me.  And I'm paraphrasing of course.

[DOYLE E.]:  That's what he said.

THE COURT:  And that was up to you; is that right?

[DOYLE E.]:  Well, he said if they don't contest the will and start a big lawsuit.

THE COURT:  So you're saying you didn't tell him in his [sic] deposition on August the [4th] this information because he didn't ask you the question?

[DOYLE E.]:  Well, he asked me that, but now, as far as that specific date, I don't remember that.

THE COURT:  I don't think he asked you a specific question here a while ago.  I may be confused.  I may have to have the court reporter look at it,

13

but it seems that we just all of a sudden started volunteering that information. You said I'll tell you what he said.

[DOYLE E.]: Well, that was the day before he died, but he was in the hospital several times.

THE COURT: But you became teary-eyed a moment ago and said I'll tell you what he said, and counsel actually brought you a tissue.

[DOYLE E.]: That's right.

THE COURT: And you said just give me a moment and I'll tell you what my daddy told me.

[DOYLE E.]: That's exactly right.

THE COURT: But you didn't feel compelled to tell him on August the [4th] that he said that?

[DOYLE E.]: No, I did not.

THE COURT: And you didn't feel compelled to tell your sisters when you were up there at the house about what your dad told you at the hospital?

[DOYLE E.]: No, I did not.

Horace Edward Damewood testified about witnessing the Will. Mr. Damewood received a telephone call from Doyle E. asking him to come to his shop and speak with Deceased. Mr. Damewood testified that he witnessed the Will that same day. He had no previous conversations with Deceased about the Will. Mr. Damewood testified that Mr. Burnett was at Doyle E.'s jewelry store when he arrived there. Mr. Damewood stated that after he arrived at Doyle E.'s store Deceased told him he was making a Will and asked if Mr. Damewood would witness it. Mr. Damewood testified that during this conversation he, his wife, Deceased, Mr. Burnett, and Doyle E. all were present.

Mr. Damewood was at the jewelry store for less than half an hour and then he drove alone to the attorney's office. He did not know how Deceased got to the attorney's office. Mr. Damewood stated that he thought that the others already were at the attorney's office when he arrived. He testified that he and Mr. Burnett waited in the

14

lobby while Deceased and the attorney were in another room. Mr. Damewood could not recall Doyle E. being there at that time. After a while, Mr. Damewood and Mr. Burnett were called back. Mr. Damewood testified that after the attorney explained to them that they were witnessing the Will, the Will was executed and witnessed. Mr. Damewood testified that they went out to the lobby after the Will was executed and witnessed, and Doyle E. was waiting there. Mr. Damewood assumed that Deceased read the Will before signing it.

Mr. Damewood testified that he had known Deceased "[a]s long as I've ever known anyone, all my life." When asked how often he saw or spoke with Deceased in 2007, Mr. Damewood stated that he worked in Knoxville and when he knew that Deceased was at Doyle E.'s shop he would stop on his way home to talk to Deceased. Mr. Damewood explained: "My father and him grew up together and it helped a lot, since I had lost my father, to reminisce of some of the, his talking of him and my father growing up."

Mr. Damewood never saw any evidence that Doyle E. attempted to influence Deceased, and he stated: "it would be a waste of his time." Mr. Damewood knew that Deceased had some health problems, but was unaware that Deceased had had a stroke. When asked about Deceased's mental capacity Mr. Damewood stated: "To me, for anyone of an age that he was, a very sharp gentleman. . . . His mind was good." He further stated:

> I have no doubt that [Deceased] knew what he was doing [the day he signed the Will]. If I did, I would not have signed. If I thought there was a problem at all, any question that he wasn't with his complete faculties I wouldn't. If I had any doubt I wouldn't.

Mr. Damewood was asked if he recalled any specific discussions with regard to the contents of the Will, and he stated that while they were at the jewelry store before going to the attorney's office:

> The only thing that was said by him was I don't want the kids, other kids to have anything. I want everything to go to Doyle. . . . But Doyle Edward, he said Dad, you've got to leave them something. He said leave them a thousand or whatever. And he said can I write them a check today? Doyle said no, Dad, you've got the will for the lawyer to write out.

K. David Myers, the attorney who drafted the Will, testified at trial. Mr. Myers testified that he knew Deceased "probably all of my life." Mr. Myers met with Deceased,

15

and Deceased told Mr. Myers that he wanted to leave $1,000 to each of his children and the remainder to Doyle E. Mr. Myers was asked if he discussed possible repercussions with Deceased, and he stated:

> I did. And I questioned him as to whether he wanted to do this because I knew his children and knew he had other children and, of course, he had discussed them. And his reasoning was that no one was helping him, no one was there to help take care of him and so forth.
>
> He had had a stroke previous to that at some time. And he and I, we discussed it pretty much at length, but that was what he wanted was that will in the way that he instructed me to write it and prepare it. And I suggested to him at that time that he bring me a doctor's statement that he was competent to execute a will. Also I mentioned, I told him that I had some ladies there in the office and myself and them would witness it, or if he had some friends, people that were more intimately acquainted with him, that he could bring someone to witness the will.

Mr. Myers was asked if he saw any evidence that Deceased was operating under undue influence or coercion, and he stated: "No. I saw nothing that caused me concern about his mental capacity or capability to execute a will and to understand what he was doing. . . . I was satisfied that he was mentally competent to execute a will and knew what he was doing." Mr. Myers testified that he suggested that Deceased obtain a doctor's note out of an abundance of caution. Mr. Myers stated he gave Deceased the Will to read and could not recall Deceased asking any questions about it. As far as he knows Deceased read the Will.

After trial the Trial Court entered its order on September 19, 2014 finding and holding, *inter alia*, that Deceased and Doyle E. had a confidential relationship, that Deceased had testamentary capacity to make and execute the Will, but that the Will was the product of undue influence and was invalid, and that Deceased died intestate. Doyle E. appeals to this Court.

## Discussion

Although not stated exactly as such, Doyle E. raises two issues on appeal: 1) whether the Trial Court erred in finding that a confidential relationship existed between Deceased and Doyle E.; and, 2) whether the Trial Court erred in finding undue influence with regard to the Will.

16

Our Supreme Court has explained:

> In a will contest, a properly executed will may be challenged on a theory that the decedent's mind was not "sufficiently sound to enable him or her to know and understand the force and consequence of the act of making the will" at the time the will was executed. *In re Estate of Elam*, 738 S.W.2d 169, 171–72 (Tenn. 1987). As this Court has said:

>> The testator must have an intelligent consciousness of the nature and effect of the act, a knowledge of the property possessed and an understanding of the disposition to be made. While evidence regarding factors such as physical weakness or disease, old age, blunt perception or failing mind and memory is admissible on the issue of testamentary capacity, it is not conclusive and the testator is not thereby rendered incompetent if her mind is sufficiently sound to enable her to know and understand what she is doing.

*Id*. (citations omitted).

> Similarly, a will may be challenged on the basis that the decedent was subject to the undue influence of another in executing the will. In Tennessee, for example, where there is a "confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises, that may be rebutted only by clear and convincing evidence of the fairness of the transaction." *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995) (citations omitted). A confidential relationship is any relationship which gives one person dominion and control over another. *See Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App.1989).

> The burden of proof regarding a confidential relationship rests upon the party claiming the existence of such a relationship. *See Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App.1983). Once a confidential relationship has been shown and a presumption of undue influence arises, the burden shifts to the dominant party to rebut the presumption by proving the fairness of the transaction by clear and convincing evidence. *Matlock v. Simpson*, 902 S.W.2d at 386; *see Gordon v. Thornton*, 584 S.W.2d 655, 658 (Tenn. Ct. App.1979). To prove the fairness of the transaction, the dominant party may show that the weaker party received independent advice before engaging in the transaction that benefitted the dominant

17

party.  *See Hogan v. Cooper*, 619 S.W.2d 516, 519 (Tenn. 1981); *see also Richmond v. Christian*, 555 S.W.2d 105, 107–08 (Tenn. 1977) (proof that the donor received independent advice respecting the consequences and advisability of the gift) (citations omitted).

*Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002).

We first consider whether the Trial Court erred in finding that a confidential relationship existed between Deceased and Doyle E.  In *Childress* our Supreme Court cited to *Mitchell v. Smith* wherein this Court explained:

> Confidential relationships can assume a variety of forms, and thus the courts have been hesitant to define precisely what a confidential relationship is.  *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974).  In general terms, it is any relationship which gives one person dominion and control over another.  *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Turner v. Leathers*, 191 Tenn. 292, 298, 232 S.W.2d 269, 271 (1950); *Roberts v. Chase*, 25 Tenn. App. 636, 650, 166 S.W.2d 641, 650 (1942).  It is not merely a relationship of mutual trust and confidence, but rather it is one
>
> > where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party.

*Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989) (quoting *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App.1973)).  "A normal relationship between a mentally competent parent and an adult child is not per se a confidential relationship and it raises no presumption of invalidity of the transaction."  *Bills v. Lindsay*, 909 S.W.2d 434, 440 (Tenn. Ct. App. 1993).

Doyle E. argues in his brief on appeal that the Trial Court erred in finding a confidential relationship existed because, among other things, the power of attorney was not executed until after the Will was executed.  We agree that given the facts and circumstances of the case now before us, a finding of a confidential relationship based upon the power of attorney would be error.  We disagree, however, that the Trial Court found a confidential relationship based upon the power of attorney.  A power of attorney does not constitute the only basis upon which a confidential relationship may be found.  As explained in *Mitchell v. Smith*: "Confidential relationships can assume a variety of forms, and thus the courts have been hesitant to define precisely what a confidential

18

relationship is." *Mitchell*, 779 S.W.2d at 389. In the case now before us the Trial Court found a confidential relationship based upon other facts.

The evidence in the record on appeal shows that Doyle E. was Deceased's primary caretaker. Doyle E. himself testified that Deceased relied upon him and trusted him and that Doyle E. saw Deceased around three times a day. Doyle E. provided Deceased with daily meals and dosed out Deceased's medication. In addition, Doyle E. assisted Deceased by paying bills and handling business affairs such as collecting rent from and, if necessary, evicting tenants. Doyle E. testified that his name was on Deceased's checking account and on Deceased's CDs. He also testified that Deceased had given Doyle E. his gun collection. The evidence is not clear about whether the guns were given as a gift or for safekeeping. Either way, Deceased trusted Doyle E. with the gun collection. The evidence also shows that Deceased relied upon Doyle E. to assist him in making telephone calls to various people including attorneys and the witnesses to the Will. The evidence in the record on appeal also shows that Deceased relied upon Doyle E. to transport him to various places including Mr. Meyers's office and to Deceased's doctor's office at different times.

The evidence in the record on appeal shows that Deceased placed confidence in Doyle E. with regard to activities of daily living and financial affairs, among other things, and that because of that confidence Doyle E. had the ability to influence and exercise dominion and control over Deceased. Some of the most compelling evidence with regard to a finding that Doyle E. had the ability to influence Deceased was the testimony of Mr. Damewood about the conversation between Deceased and Doyle E. just prior to the execution of the Will wherein Deceased made a statement about his other children and Doyle E. said "Dad, you've got to leave them something . . . leave them a thousand or whatever," which is exactly what the Will provided.

We also note that the Trial Court's decision, at least in part, was "based upon my observation of the witnesses in this court." The Trial Court also noted that some of Doyle E.'s testimony was "somewhat concerning . . . ." We will defer to the Trial Court's credibility determinations based upon observation of the witnesses at trial. The evidence in the record on appeal does not preponderate against the Trial Court's finding that a confidential relationship existed between Doyle E. and Deceased.

Having affirmed the finding of a confidential relationship, we now consider whether the Trial Court erred in finding undue influence with regard to the Will. As this Court explained in *Delapp v. Pratt*:

It is well settled in Tennessee "that the existence of a confidential relationship, followed by a transaction wherein the dominant party receives

19

a benefit from the other party, a presumption of undue influence arises, that may be rebutted only by clear and convincing evidence of the fairness of the transaction." *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995). However, as this Court discussed in *In re: Estate of Maddox*:

> Proof of the existence of a confidential relationship, by itself, will not be sufficient to invalidate a will. It is not the relationship that concerns the courts but rather the abuse of the relationship. Proof of the existence of a confidential relationship must be coupled with evidence of one or more other suspicious circumstances that give rise to a presumption of undue influence.

*In re: Estate of Maddox*, 60 S.W.3d 84, 89 (Tenn. Ct. App. 2001) (citations omitted).

It is rare to find direct evidence of undue influence. *Id*. at 88. Usually, to prove undue influence, one "must prove the existence of suspicious circumstances warranting the conclusion that the person allegedly influenced did not act freely and independently." *Id*. "The suspicious circumstances most frequently relied upon to establish undue influence are: (1) the existence of a confidential relationship between the testator and the beneficiary, (2) the testator's physical or mental deterioration, and (3) the beneficiary's active involvement in procuring the will." *Id*. at 89. Some other recognized suspicious circumstances are:

> (1) secrecy concerning the will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the will; (4) the testator's illiteracy or blindness; (5) the unjust or unnatural nature of the will's terms; (6) the testator being in an emotionally distraught state; (7) discrepancies between the will and the testator's expressed intentions; and (8) fraud or duress directed toward the testator.

*Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989). "The courts have refrained from prescribing the type or number of suspicious circumstances that will warrant invalidating a will on the grounds of undue influence." *Id*.

*Delapp v. Pratt*, 152 S.W.3d 530, 540-41 (Tenn. Ct. App. 2004).

20

Once a confidential relationship between Deceased and Doyle E. was proven, a presumption of undue influence arose and the burden shifted to Doyle E. to prove by clear and convincing evidence the fairness of the transaction involving the Will. *See Childress*, 74 S.W.3d at 328. With regard to this issue the Trial Court specifically found, *inter alia*:

> I am concerned about the fact that Doyle E. Dukes did not recall James Humbird, especially during the depositions. He was very adamant to me testifying today that he just simply was taking care of his dad. His dad wanted to make the will. He made the arrangements, called the witnesses. These are good people, the witnesses. I don't think there's any question about these witnesses are good people. . . . Doyle E. Dukes makes a point to say he never looked at [the Will], didn't want to know what was in it, but asks his girlfriend, who testified that for the last 10 years have been boyfriend girlfriend, and wanted her to check the spelling. That seems a little odd to me.

* * *

> But then Horace testified today, and this is the first I had heard this, that apparently there was a declaration made in the office of Doyle E. Dukes prior to going to the attorney's office that dad absolutely intended to leave everything to Doyle E. Dukes and that Doyle E. Dukes is the one that suggested leaving his sisters $1,000.

> If I recall the testimony correctly, Doyle E. Dukes made a point to say he knew nothing of the contents of that will, not specifically. Perhaps maybe he didn't know the wording of the will, but the will was obviously in his possession during the entire time, but he had a conversation with his father on his deathbed, a day before his deathbed, that his father insisted that he wanted his wishes carried out, that he didn't want his sisters to have anything. I find that somewhat concerning too.

The evidence in the record on appeal shows that a number of suspicious circumstances were proven. The evidence shows that prior to the Will's execution Deceased always treated all of his children equally. The evidence further shows that prior to executing the Will Deceased had on more than one occasion expressed an intent different than the one expressed in the Will. While it is certainly possible that Deceased changed his mind prior to executing the Will, this evidence coupled with the other facts and circumstances in this case constitutes a suspicious circumstance.

Furthermore, several key facts were elicited during the trial testimony of Doyle E. that Doyle E. had failed, for one reason or another, to disclose prior to trial. The Trial Court expressed its concern with regard to these important and hitherto undisclosed facts. Among these previously undisclosed significant facts were the fact that Deceased had consulted with James Humbird about making a will and the facts regarding the conversation that Doyle E. testified that he and Deceased had shortly before Deceased's death. In addition, although Doyle E. insisted that he knew nothing about the terms of the Will until after Deceased's death, his own testimony about the conversation he and Deceased had shortly before Deceased's death belies this assertion. Doyle E.'s testimony about asking his girlfriend to read the Will to check spellings because Doyle E. "knew [Deceased] was going to name all the children," also shows that Doyle E. had some knowledge about the terms of the Will prior to Deceased's death. Additionally showing that Doyle E. knew at least something about the Will's terms is Mr. Damewood's testimony regarding the conversation that happened prior to the execution of the Will in which Deceased stated that he did not want his other children to get anything, and Doyle E. told Deceased that he needed to leave them something and suggested that Deceased "leave them a thousand or whatever."

The evidence in the record on appeal also shows that Deceased was 90 years old at the time of the execution of the Will, had previously suffered a stroke, and had diabetes. Further, the evidence shows a dispute about whether Deceased would have been able to read the Will. The evidence shows that Deceased had between a third and a sixth grade education. Both Mary Lou and Melbia testified that they offered to do more to assist Deceased and that they were told by Doyle E. that they could not and that he had things under control. Furthermore, both Mary Lou and Melbia testified that they were unaware of the existence of the Will and its terms until after Deceased's death.

We defer to the Trial Court's credibility determinations. The Trial Court found that Doyle E. had failed to rebut the presumption of undue influence by clear and convincing evidence. The evidence in the record on appeal does not preponderate against this finding made by the Trial Court. As such, we find no error in the Trial Court's finding that the Will was the product of undue influence. Given all of the above, we affirm the Trial Court's September 19, 2014 order in its entirety.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Doyle Edward Dukes.

_____
D. MICHAEL SWINEY, JUDGE