FILED
08/13/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 18, 2018 Session

**IN RE ESTATE OF IDA LUCILLE LAND**

**Appeal from the Chancery Court for Hamilton County**
**No. 16-0013     Jeffrey M. Atherton, Chancellor**

_____

**No. E2017-01429-COA-R3-CV**

_____

Judy A. Allen ("Allen") filed suit contesting the Last Will and Testament of Ida Lucille Land dated May 9, 2011 ("the Will"), which was admitted to probate in October of 2015. The case proceeded to trial before a jury, and after trial the Chancery Court for Hamilton County ("the Trial Court") entered judgment on the jury's verdict finding that there was undue influence arising from a confidential relationship between Kenneth L. Hill ("the Executor") and his wife, Pauline Hill, and Ida Lucille Land ("Deceased"); that the Executor and Pauline Hill unduly benefitted from the Will; and that the Executor and Pauline Hill failed to prove by clear and convincing evidence that the transaction was fair. The Executor appeals to this Court raising issues regarding whether the naming of a person as executor is a sufficient benefit to trigger the presumption of undue influence and whether the Trial Court erred in denying the Executor's motion for directed verdict. We find and hold that there is material evidence supporting the jury's verdict that the Executor and Pauline Hill exercised undue influence, that they received a benefit under the Will, and that the Executor and Pauline Hill failed to prove that the transaction was fair. We further find and hold that the Trial Court did not err in denying the motion for directed verdict. We, therefore, affirm the Trial Court's June 8, 2017 Final Decree.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which RICHARD H. DINKINS and JOHN W. MCCLARTY, JJ., joined.

Buddy B. Presley, Jr. and Terrance L. Jones, Chattanooga, Tennessee, for the appellant, Kenneth L. Hill.

Whitney Durand, Chattanooga, Tennessee, for the appellee, Judy A. Allen.

# OPINION

## Background

Ida Lucille Land died in August of 2015 at the age of 99 with no surviving spouse or children. The Executor was granted Letters Testamentary in October of 2015, and the Will was admitted to probate in common form. Allen, Deceased's niece, filed suit contesting the Will. The case proceeded to trial before a jury in March of 2017.

The Executor is married to Pauline Hill who was the sister of Charles Land ("Mr. Land"). Mr. Land was Deceased's second husband. Deceased and Mr. Land were married until the death of Mr. Land, which occurred shortly before the death of Deceased. At the time of his marriage to Deceased, Mr. Land had three adult children from a previous relationship, Carlus Elaine Lloyd ("Lloyd"), Sharon Yvonne Leming ("Leming"), and Charles David Land. The Will names Lloyd, Leming, and Charles David Land as the beneficiaries of Deceased's estate.

At trial, Allen testified that Deceased was her maternal aunt, and that Allen had "always been around" Deceased. Allen stated that she and Deceased would go out to eat frequently and would also go shopping or spend time with Deceased's sisters and that Allen drove her aunts around. Allen testified that she and Deceased celebrated Christmases, birthdays, and some other holidays together.

Allen explained that Deceased's first marriage lasted approximately 50 years and ended when Deceased's first husband died sometime around 1984. After the death of Deceased's first husband, Allen moved in with Deceased for approximately 14 months. Allen then married, and she and her husband lived with Deceased for "a little over a year" while Allen and her husband built a house.

In 1986 or 1987 Deceased married Charles Land ("Mr. Land"). Deceased and Mr. Land remained married until the death of Mr. Land, which occurred shortly before Deceased died.

Allen's father, who was a custom home builder, constructed Deceased's house in the early 1970s for Deceased and her first husband. Allen testified that Deceased would call Allen's father if she needed repairs to her house. Allen's father also plowed Deceased's garden, cleared leaves out of the gutters, and mowed Deceased's yard for years. Allen stated, "[Deceased] wouldn't let anybody else do anything for her except him." Deceased continued to call Allen's father for assistance with the house even after Deceased married Mr. Land. Allen stated that Deceased would say "[Mr. Land] can't do anything." This pattern of Deceased contacting Allen's father for assistance continued

2

until the time of an incident, which occurred in May of 2011, after which Allen was no longer allowed to visit Deceased's house.

In 2009, Deceased fell and broke her pelvis. Allen testified that from that point on she "started taking care of [Deceased] some and giving her meals and that type thing." Allen testified that she and her sister would rotate and take meals to Deceased and Mr. Land every other day for approximately a year after Deceased's accident so that Deceased would not have to cook. Allen explained that Mr. Land had a pulmonary problem and later had a pacemaker put in and had difficulty doing household chores. Allen stated that Deceased "always depended on" Allen and would call on Allen for help if Deceased had a banking or insurance problem.

Allen's mother died in 2009. In 2010, Allen retired. Allen testified that sometime after her mother died:

> I was down there [at Deceased's house] one morning fixing them some breakfast. And [Deceased] asked me, she said, I want to ask you something. And I said, yeah, anything. She said, will you take care of me like you did your mom? And I said, you know that I will. I will always be here and I'll take care of you. Because she was like my mom. I had been with her so long. And that was my intention. And that's what I was hoping to do, but it didn't work out that way.

In 2010, Deceased asked Allen to take her to an attorney so that Deceased could make a will. Deceased told Allen that she was not going to tell Mr. Land "because he had been fussing about her wanting to get one done." Allen testified that Deceased stated: "I do not want - - and these were her specific words - - I do not want his children to have what I got." Allen took Deceased to an attorney, and Deceased instructed the attorney to mail the completed will to Allen because Deceased did not want Mr. Land to know about it. Allen stated that Mr. Land was upset when he found out about the 2010 will, and "he aggravated her and aggravated her about it."

In January of 2011, Deceased suffered another fall and broke her hip and her right wrist. After her release from the hospital, Deceased spent approximately twelve weeks in a nursing home. Allen testified that while Deceased was in the nursing home Allen "was there every day, every day from 9:00 until about 4:00." Allen stated that she would leave for an hour for dinner and if Deceased was unhappy with the food being served in the facility that day, Allen would bring her something else to eat and then stay until Deceased went to bed for the night.

Allen testified that during Deceased's nursing home stay after her fall, Deceased was confused about how she was paying for the stay. She told Allen that she was working. Allen explained: "Because they do therapy. And she would go into a little area like kitchen and, you know, put dishes and different things away. So she thought she was working to pay for her room there."

Allen testified that Deceased sometimes got confused about other things while she was in the nursing home. Deceased would ask Allen how Allen's mom was and Allen would need to remind Deceased that her mother had passed away. Allen also testified that sometimes at night Deceased "would be so agitated and upset and confused and didn't realize where she was at," and the staff would call Allen who then would go to the facility to talk to Deceased and calm her down.

After Deceased was released from the nursing home to go home in April of 2011, Allen continued to care for Deceased on a daily basis. Allen would go over to Deceased's house in the morning, give Deceased a bath, administer Deceased's medications, and make sure that Deceased and Mr. Land had something to eat. Allen stated that Deceased was "in fairly good health" and took only a blood pressure medication and Prilosec and, after she broke her hip, a pain pill.

Allen testified that Deceased was supposed to have 24/7 care when she was released from the nursing home. Allen stated that they had a family meeting where it was suggested that Deceased go into a nursing home, but Deceased refused. Allen stated:

> And then during that meeting, I said that I would - - I was going to take care of her. That's what I had planned on doing was taking care of her. And so Pauline Hill, she spoke up and she said, well, I can't. She said because - - she said, I can't take care of anybody else. She had taken care of her mother-in-law and she said, I can't take care of anybody else. So anyway, they went home. And I went until the - - all the other altercations started with the fussing and the fighting.

Deceased maintained a checking account with Mr. Land. Deceased also had a savings account ("Deceased's Account") that Mr. Land was unaware of until April of 2011. Allen explained that when Deceased had a problem years ago with her insurance lapsing, she called Allen who took Deceased to the bank to withdraw money to cover the insurance. Deceased withdrew $2,000 from Deceased's Account to reinstate her insurance, leaving a balance in the account of approximately $30,000. At that time, Deceased put Allen's name on Deceased's Account. A bank statement for Deceased's Account dated March of 2011 showed that the account at that time had a balance of just over $30,000.

4

Allen was asked what she knew about Mr. Land's condition in 2011, and she stated:

Well, like I said, you know, he had some medical issues, breathing. But other than that, I mean, you know, we had never had any problems. I treated him just as well as I did [Deceased]. But then when a lot of the problem - - when he changed - - when he turned against me was when I had brought him some papers to fill out for the VA, because I had worked at the VA. And to fill out - - to help him to get some hearing aids. I was trying to help him to get on to get those. And part of the medical - - the financial part, I didn't fill out. So his son took him to the bank. That's when they found out that [Deceased] had $32,000 in a savings account. And when he found that out is when everything changed.

Allen testified that Mr. Land found out about Deceased's Account on April 27, 2011. On April 29, 2011, the banker telephoned Allen. Allen explained:

[The banker called me] and he said, Judy, they are down here, Mr. and Mrs. Land are down here. He wants to have your name took off this and you're stealing their money. He said, I'm trying to explain to them there is not a penny out of here. Nothing has been taken.

Allen did not say anything to Mr. Land about Deceased's Account until May 5, 2011.

Allen testified that on May 2, 2011:

That was when [Deceased] came home from Life Care, and so I was down there every day. And I'm not sure the exact day. I had taken her to the doctor. [Mr. Land] wouldn't ride with us, so he had to call his daughter to take him. He wouldn't ride with me and [Deceased]. And so she took him, and I took [Deceased]. Went to the doctor, came home. And when we came home, he said - - he told me, he said, [Deceased] was supposed to tell you. He said, she won't tell you, but I don't want you back down here anymore.

I said, I'm here to take care of [Deceased]. She asked me to take care of her and that's what I'm going to do. No, you're not. You're not going to take care of her. I'm going to take care of her. Well, he couldn't even lift anything off the floor. There ain't no way he could lift her, you

5

know, if she fell. Because he would always call my dad or my husband when she would fall.

And so anyway, he said, I don't want you to come back no more. I said, I will come back because I'm going to take care of [Deceased] like I promised. So I left.

On May 3, 2011, Allen went back to Deceased's house. She stated:

And so when I walked into the house, [Mr. Land] had a pistol laying right beside his chair, his recliner. And so when I saw that pistol laying there, I called my dad and I called the police. And I told them, I said, I took it that he threatened me yesterday when he told me not to come back. Because he said, I will take care of you.

And so the police got there and they removed all of the guns from the house, some of which was my Uncle Ted's, [Deceased's] first husband. And the police removed all the shells out of all the guns. And then that's when all the other stuff started about the altercations between that family and my family.

On May 5, 2011, Allen went back to Deceased's house to administer Deceased's medications, and Mr. Land's children and one of his grandchildren were there. Allen stated: "I looked over at him. And I never touched him, never put a finger on that man. I looked at him and I said, you lied to me - - you lied about me to the banker. I said, I have never took a penny of your money or [Deceased's] money." Allen stated:

And so that's the only thing I did. I told him, I said, you lied on me. You told a lie. I have never touched a penny.

Well, when I said that, all of his kids come running out of every room and grabbing me, grabbed me around my neck, one of them did. And I was trying to fight her off. Then another grandkid came up and she grabbed me, and they was screaming. That's when my husband was in the car waiting on me. He heard all the screaming, so he came in and he pulled his daughter off of me and laid her on - - he didn't throw her. He laid her on the couch. So then the police came and we had all - - you know, police reports and all of that.

The ambulance was called but Leming, Mr. Land's daughter, refused to go to the hospital. Allen stated that Leming said she wasn't hurt.

6

When asked why she hadn't said something to Mr. Land about Deceased's Account sooner, Allen stated:

> I was waiting to get back with [the man at the bank]. We were trying to work something out and he was trying to delay it from having their names - - my name taken off. He was delaying it several days before he could do that, because I was trying to get my attorney to work on it at that time. . . . [The man at the bank] was helping me, yes, because he knew I had not taken any money.

Allen testified that after the incident on May 5, 2011:

> And so - - and there were cars there constantly of the Hill and Land family making sure that I didn't come by there or didn't come there any longer. So even if I drove by - - and I only live like a mile up from her house. I would have to drive that way every day. And every time I would drive by, they would call the police on me.

Allen testified that after the incident a police officer came to her house and stated that the family reported that Allen was not giving Deceased her medications. Allen then had police escort her to Deceased's house every morning and night for the next eight days so she could administer Deceased's medications, after which time the police told her they could no longer provide an escort. Allen then took the medications and left them at Deceased's house. Allen was asked why she had kept Deceased's medications, and she stated:

> Because she was confused and she didn't know if she took it in the morning or in the afternoon. And at that time, all of this was taking place and there was a gang of people down there constantly. I mean, there was like six and seven cars down there constantly like they were waiting on her to die. And even the police that came and got me said they are sitting down there on their truck beds like vultures. That's why I kept the medicine.

Five or six days after the incident on May 5, 2011, someone put no trespassing signs up on Deceased's property. Allen stated:

> And in five days - - in five days, my name was off of all the bank accounts, a new will had been done. My name was off of that. And when I would drive by, they were taking them somewhere every day. So for five days,

7

they were gone taking care of business, and then the locks on the house were changed.

Before the locks were changed, both Allen and her father had keys and door openers to Deceased's house.

Prior to the incident on May 5, 2011, Deceased had executed a power of attorney naming Allen as her attorney-in-fact. On May 12, 2011 Allen received a cancellation of that power of attorney from attorney William Thomas Bible, Jr. ("Attorney Bible").

Allen was asked what contact she had with Deceased after the incident of May 5, 2011, and she stated:

Well, [Deceased] would tell me several times, she would say, he is not like - - he is not the man - - he is not like he was when I married him. And the times that I had been down there, he was hateful. He had gotten to where he was hateful to her. Just for incident (sic), the morning that I was taking her to the doctor and he refused that I drive him. He just refused. And they got into an argument. And so, I mean, he just - - he was just - - just got hateful and hateful with her.

On May 17, 2011, Allen telephoned Deceased to tell her that Deceased's brother had been admitted to the hospital. Allen told Deceased that the family was upset by what Mr. Land's children were doing to Deceased, and Deceased responded that it wasn't Mr. Land's children, it was Allen. Deceased told Allen not to call anymore. On Christmas day in 2011, Allen telephoned Deceased to wish her a merry Christmas, and Deceased told Allen she didn't want to talk to her and hung up.

After Mr. Land told Allen not to come back anymore, Allen wrote a letter to Deceased's doctor, Dr. Brooksbank. Allen explained in this letter that she no longer was allowed to see Deceased and expressed concern for Deceased's wellbeing because:

[Deceased] and [Mr. Land] were both released from Life Care of Collegedale or [sic] April 11th, 2011, with the agreement that I would take care of the needs for the - - for [Deceased] since she had no children and designated me as her POA. They were both diagnosed with dementia at Life Care.

In February of 2012, Allen learned that Deceased had been hospitalized. Allen called the hospital, and Deceased answered the phone in the room. Deceased did not realize that she was speaking to Allen on the phone. Allen asked what was going on, and

Deceased told Allen that Deceased had a urinary tract infection. Allen then ended the conversation.

In January of 2013, Deceased was transferred permanently to a nursing home. Allen testified that she would visit Deceased in the nursing home often, and Deceased would tell Allen "don't let them catch you here, because they told me if you came, to tell you to leave. And she was talking about [Mr. Land's] kids." Allen would visit two or three times a week and would go early in the morning to avoid seeing Mr. Land's children. Allen made lap afghans for the nursing home patients, and she and her father were invited to attend the Christmas party for volunteers, which they attended with Deceased. Allen would occasionally see the Executor or Pauline Hill at the nursing home, but engaged in little conversation with them. Allen testified that Deceased would tell Allen: "they are taking my money, they are taking my money." Allen explained to Deceased that she did not need money in the nursing home, and Deceased said: "Pauline won't even give me a penny. . . . [T]hey are taking my money. I know they are stealing my money."

Pauline Hill testified at trial. She is married to the Executor. Ms. Hill explained that she was Mr. Land's sister and Deceased's sister-in-law. Ms. Hill considered Deceased "a good friend." Ms. Hill testified that when Deceased broke her hip in January of 2011, Ms. Hill began cooking and running errands for Deceased. When asked if she were aware that Allen was doing the same things, Ms. Hill stated: "Not that much. She may have done some, but not quite that much that I know of." Ms. Hill testified that she was taking meals to her brother and Deceased every other day.

Ms. Hill testified about the making of the Will. She testified that after the incident of May 5, 2011, Mr. Land's daughters, Leming and Lloyd, recommended Attorney Bible. Leming previously was one of Attorney Bible's clients. Ms. Hill was asked who set up the meeting with Attorney Bible, and she stated:

Well, my husband and I and the three children, we took them to see the lawyer. They wanted to meet him, all of them. They wanted their kids and my husband and I to meet him. So we all went and talked to Mr. Bible. They told him what happened and why they wanted to change their will.

Ms. Hill clarified that she meant Mr. Land's and Deceased's 'kids.' When it was pointed out that they were not actually Deceased's children, Ms. Hill stated: "Well, they claimed them her kids, yeah. . . . It was actually part of her family, kids." Ms. Hill was asked on what occasion Deceased claimed Mr. Land's children as her children, and she stated: "Well, I don't know. I guess, you know, she married in the family and she just accepted [Mr. Land's] kids. Yeah. They all got along and everything." When asked why she

9

believed that they got along before the incident of May 5, 2011, Ms. Hill stated: "Well, I never did really see anything going on bad with them.  No."

Ms. Hill was asked how the incident of May 5, 2011 occurred, and she stated:

> Well, [Allen] made a phone call to [Deceased] and wanted to take [Deceased] out for breakfast the next morning.  And she said, [Allen], I'll call you back.  And [Mr. Land], her husband, said, I would rather you wouldn't go, [Deceased].  I would just rather you didn't go.  He did not want her to go. . . .  And so within - - she called [Allen] back and said no.  And within about 10 minutes, here comes [Allen], her husband, and her father in like raging dogs, got ahold of Mr. Land, shook him.  And he just had a pacemaker put in two weeks before that. . . .  He was sitting in his recliner.  He is not a very big man, little man.  No, he is not big at all. . . .  Well, you would say taller, but he was sitting in a chair and she just come up and shook him and said you don't need to tell her what to do.  Now, I didn't witness this, but Mr. Land told me.  My brother told me and also the ones that was there that witnessed that.

Ms. Hill was asked about Deceased's and Mr. Land's feelings about Allen after the altercation, and she stated: "It wasn't good. . . .  It scared them. . . .  And they lost trust in her, yes.  They would not have changed that will, but they were afraid.  And it really upset them because there was abuse there that shouldn't have been."

After the incident of May 5, 2011, Ms. Hill held Deceased's power of attorney. When asked how she became Deceased's attorney-in-fact, Ms. Hill stated: "Well, she wanted me to be because there was - - a bad episode happened at their home one night that was really bad, abusive, and they wanted me to be the power of attorney and my husband the executor.  They [meaning Deceased and Mr. Land] wanted to change the will."  Ms. Hill was asked how long it was after she was granted the power of attorney before Deceased was put into a nursing home, and she stated:

> Well, they needed some help.  And my husband and I and their kids - - you know, she had to be in a nursing home. . . .  Well, she didn't really want to go.  She didn't want to go to no nursing home.  She would have liked to have stayed home and been taken care of, but there was no one to take care of her.  Everybody worked and we had no other choice.

Ms. Hill testified that she and her husband applied for TennCare on Deceased's behalf.  She stated that they applied "because we didn't know how long they were going to be in the nursing home, what all was going to take place with them."  On the

application for TennCare, Ms. Hill filled in an amount for a checking account of $1,600 and a savings account, which was Deceased's Account, of $300. Ms. Hill was asked if the balance in Deceased's Account actually was closer to $30,000, and she stated: "It was 32,000." When asked why she put $300 on the TennCare application instead of the correct amount, Ms. Hill stated: "I don't know. . . . You know, I never filled one of these out in my life. It's just a mistake."

TennCare approved and paid benefits for Deceased, and Ms. Hill admitted that after Deceased's death TennCare filed a claim against Deceased's estate for alleged overpayments. Ms. Hill testified that they recently received a letter "saying that the house would have to be sold and they would be wanting their money."

Ms. Hill was shown a document that she stated she had prepared to show the "money that was spent out of the 32,000 [in Deceased's Account] . . . ." She explained:

> This has been taken off of the registers that I turned in when I would make a check out for, like, when we had the basement worked on, the supports in the basement. And then we had to - - well, all of this. Yeah. This is my handwriting. And when I would make a check out, I would document it and deduct it from the $32,000. That was money in there that - - to take care of them, and that's what I wanted to do with it.

> We didn't spend anything on ourself. It was all on their - - their stuff. The house, the taxes, fire insurance, work on the air-conditioner, the sewer, had to have a sewer line put in, and had to have a big tree cut down that was dead. Just all this stuff. Every bit of this stuff was taken out of the $32,000 that was in the bank of theirs.

The exhibit showed a beginning balance of over $32,000 in Deceased's Account and an ending balance of less than $7,000.

Ms. Hill was asked about a notation showing a payment of $2,000 to Lloyd, who is one of Mr. Land's children, and was asked to explain, and she stated:

> Yes. They were going - - she was going through a rough time and I let her have some money, but she paid me back and it was put right back in there. Yeah. I've got receipts showing that the money was put back. She was going through a rough time and she needed some help, and so I loaned her that money out of that 32,000, but it was put back. It sure was.

11

When asked what gave her the right to loan the money to Mr. Land's child, Ms. Hill stated:

> Well, I was a power of attorney. I was in control of that money. . . . Well, they had been married 26 years. What was hers was his, and I did not think that it would be wrong when I knew good and well that she was going to put it right back. I wanted to be a help to them. I considered both of their kids, you know . . . .

Ms. Hill also loaned $500 from Deceased's Account to Lloyd on another occasion, and testified that this money also was paid back. When questioned further, Ms. Hill admitted that she loaned $800 from Deceased's Account to her own and the Executor's daughter, but testified that this money also was paid back. When asked what made her think she could loan Deceased's money to her own children, Ms. Hill stated: "Well, it was just going to be for a short time, just for a short time."

Ms. Hill was asked about another transaction noted on the exhibit about Deceased's Account, and she stated:

> That was cash out, Regions Bank. Oh, I had made a mistake. My husband and I were out that day making deposits and I somehow or another got mine mixed up with hers, but I put it back. I didn't mean to do that. We were going to her bank and my bank making deposits. So yeah. So that's a mistake, a big mistake I didn't mean to make.

Lloyd testified at trial that she was 38 years old when her father married Deceased, and that Deceased treated Lloyd like her own daughter. Lloyd was asked about the incident of May 5, 2011, and she stated:

> I was coming in from work and I saw my sister's car sitting in front of dad and [Deceased's]. Dad had just had a pacemaker in six days prior to that. And so I stopped in to see what was going on, you know, if everything was okay. And it was. So we were visiting. My daughter Angela Johnson, she came in. I know she was going to give them the graduation notice, you know, from her daughter.
>
> And we were all visiting with them, and the telephone rang. So - - and [Deceased] answered it. And she said, [to her husband], [Allen] is wanting me to go out to eat in the morning and do you care. And he said, no, I would prefer you didn't. So she told [Allen] that [her husband] didn't want her to go. So - - and hung up the phone. It wasn't 15 or 20 minutes

12

later, that - - . . . It wasn't 15 or 20 minutes, you know, later that [Allen] and her husband Kirby and her father Carl Walker came through the kitchen door. And she went over and she was hollering at [Deceased]. How could you let this man tell you no? And then she ran over to my dad and she was shaking him and hollering at him, who do you think you are to tell her that she can't go out to eat with us? And just shaking him.

And so my sister was right here beside dad. And so she stood up to put her hand on the shoulder to tell [Allen] to quit shaking our father. That's when her husband Kirby - - she grabbed my sister. He grabbed my sister up around the neck and threw her to the couch. And then I was telling my daughter to call the police, and I got up and was trying to call my son-in-law - - Sharon's husband - - to get up there, that Sharon was hurt. My sister got torticollis where her neck goes over to the side.

So I was checking on her. She said she was getting sick. So I was trying to get a wash cloth to put on her. And it just sort of escalated. My daughter had 911 on the phone and she kept telling [Allen] that she had 911 on the phone. And so [Allen] was hollering at her, I don't care, I don't care, I don't care.

And really, I didn't see anything. I was trying to take care of my sister and then get my brother-in-law - - son-in-law up there. And the police came, so they escorted them outside. They did not take our statement. They did not take dad and [Deceased's], you know, statement at all. They did ask my sister if she wanted to press charges, but they told her that if she did, all of us would have to go to the police including dad and [Deceased]. And she didn't want to do that.

Then he asked her did she want an ambulance and she said, no, she didn't.

Lloyd was asked what she did after the day of the incident, and she stated: "Well, they were scared to death. I had to start staying every night with them." She testified that Deceased and Mr. Land were afraid of: "Her coming back and shaking dad or doing something to [Deceased] again." Lloyd testified that Deceased wanted to change her will and that Deceased told Lloyd she wanted everything to go to Mr. Land and if he predeceased her she wanted it to go to Mr. Land's children. Lloyd testified that she went with them when they took Deceased to meet with Attorney Bible.

13

Angela Johnson, Mr. Land's granddaughter, testified that she had a good relationship with Deceased who was her step-grandmother. Ms. Johnson testified about the incident of May 5, 2011 stating:

It was my youngest daughter's high school graduation and I was there delivering a graduation invitation, even though I knew they were not going to be able to go because of their health and being able to drive down to the arena and everything. I always went up there with invitations for birthdays, graduations, whatever.

And so I was there with my mom and my aunt, and we were - - I don't even remember what all we were talking about except for the high school graduation. And the next thing I know, [Allen] and her father and her husband came in and there was an altercation. . . . They just come straight on in. And we were all in the living room and she come barging in and yelling and screaming. . . . She was upset because my grandmother did not go to the Cracker Barrel with her and my grandmother's brother that morning. . . . She proceeded to shake my grandfather. She was mad at him saying that he had no right to tell my grandmother that she couldn't go with them to breakfast. And so then I called the law, and my aunt and I got her off of my grandfather. Her husband grabbed my aunt and threw him on the - - threw her on the couch. Then he grabbed me and I turned around and told him to get his hands off of me. And shortly after that, I was - - while I was still on the phone with the 911 dispatcher, the law showed up. . . . [Allen] and them were made to go outside. We all stayed in the house. There was no statements made on our end because they said if we pressed charges, all of us would go to jail. And my grandparents and my aunt were in no shape to go to jail that night. So my aunt was hurt. . . . She had medical issues before, but after she was thrown on the couch, there was something going on with her throat. And she has just had a lot of medical issues since then also. She has RA. . . . Rheumatoid arthritis.

Ms. Johnson testified that after the incident she and her mother took turns staying with Deceased and Mr. Land. She stated: "My grandfather was scared to be by himself and so was my grandmother." Ms. Johnson testified that she and her mother continued taking turns staying with them for over a year until her grandfather broke his hip and went into a nursing home. Deceased already was in the nursing home when Mr. Land was admitted.

After trial, the jury returned a verdict answering three specific questions:

14

1. Did Judy Allen, by a preponderance of the evidence, prove that there was undue influence arising from a confidential relationship between Kenneth Hill and Pauline Hill and the deceased, Ida Lucille Land?

\* \* \*

2. Did Judy Allen, by a preponderance of the evidence, prove that Kenneth Hill and Pauline Hill unduly profited from the Will of the deceased, Ida Lucille Land?

\* \* \*

3. Did Kenneth Hill and Pauline Hill, by clear and convincing evidence, prove that the transaction was fair?

The jury answered the first two questions 'yes' and the third question 'no.' The Trial Court entered judgment on the jury's verdict on June 8, 2017. The Executor filed a Motion for Judgment in Accordance with Rule 50.02 Motion Made During Trial and For a New Trial[1], which the Trial Court denied by order entered July 6, 2017. The Executor appeals to this Court.

## **Discussion**

Although not stated exactly as such, the Executor raises two issues on appeal: 1) whether the Trial Court erred in holding that the nomination of a person as executor was a sufficient benefit to trigger the presumption of undue influence[2]; and 2) whether the Trial Court erred in denying the Executor's motion for directed verdict.

We first consider whether the Trial Court erred in holding that the nomination of a person as executor was a sufficient benefit to trigger the presumption of undue influence. Our Supreme Court has explained:

[A] will may be challenged on the basis that the decedent was subject to the undue influence of another in executing the will. In Tennessee, for example, where there is a "confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises, that may be rebutted only

---

[1] The Executor verbally made a motion for directed verdict during trial.

[2] In his brief on appeal, the Executor concedes: "There is almost certainly sufficient evidence for a jury to find that a confidential relationship existed between Kenneth and Pauline Hill and [Deceased]." We agree.

15

by clear and convincing evidence of the fairness of the transaction."
*Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995) (citations omitted).
A confidential relationship is any relationship which gives one person
dominion and control over another. *See Mitchell v. Smith*, 779 S.W.2d 384,
389 (Tenn. Ct. App. 1989).

The burden of proof regarding a confidential relationship rests upon
the party claiming the existence of such a relationship. *See Brown v. Weik*,
725 S.W.2d 938, 945 (Tenn. Ct. App. 1983). Once a confidential
relationship has been shown and a presumption of undue influence arises,
the burden shifts to the dominant party to rebut the presumption by proving
the fairness of the transaction by clear and convincing evidence. *Matlock v.
Simpson*, 902 S.W.2d at 386; *see Gordon v. Thornton*, 584 S.W.2d 655, 658
(Tenn. Ct. App. 1979). To prove the fairness of the transaction, the
dominant party may show that the weaker party received independent
advice before engaging in the transaction that benefitted the dominant
party. *See Hogan v. Cooper*, 619 S.W.2d 516, 519 (Tenn. 1981); *see also
Richmond v. Christian*, 555 S.W.2d 105, 107–08 (Tenn. 1977) (proof that
the donor received independent advice respecting the consequences and
advisability of the gift) (citations omitted).

*Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002).

This Court further discussed undue influence in *Delapp v. Pratt* stating:

It is well settled in Tennessee "that the existence of a confidential
relationship, followed by a transaction wherein the dominant party receives
a benefit from the other party, a presumption of undue influence arises, that
may be rebutted only by clear and convincing evidence of the fairness of
the transaction." *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995).
However, as this Court discussed in *In re: Estate of Maddox*:

Proof of the existence of a confidential relationship, by
itself, will not be sufficient to invalidate a will. It is not the
relationship that concerns the courts but rather the abuse of
the relationship. Proof of the existence of a confidential
relationship must be coupled with evidence of one or more
other suspicious circumstances that give rise to a presumption
of undue influence.

16

*In re: Estate of Maddox*, 60 S.W.3d 84, 89 (Tenn. Ct. App. 2001) (citations omitted).

It is rare to find direct evidence of undue influence. *Id*. at 88. Usually, to prove undue influence, one "must prove the existence of suspicious circumstances warranting the conclusion that the person allegedly influenced did not act freely and independently." *Id*. "The suspicious circumstances most frequently relied upon to establish undue influence are: (1) the existence of a confidential relationship between the testator and the beneficiary, (2) the testator's physical or mental deterioration, and (3) the beneficiary's active involvement in procuring the will." *Id*. at 89. Some other recognized suspicious circumstances are:

> (1) secrecy concerning the will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the will; (4) the testator's illiteracy or blindness; (5) the unjust or unnatural nature of the will's terms; (6) the testator being in an emotionally distraught state; (7) discrepancies between the will and the testator's expressed intentions; and (8) fraud or duress directed toward the testator.

*Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989). "The courts have refrained from prescribing the type or number of suspicious circumstances that will warrant invalidating a will on the grounds of undue influence." *Id*.

*Delapp v. Pratt*, 152 S.W.3d 530, 540–41 (Tenn. Ct. App. 2004).

Before we begin our analysis of the issue raised by the Executor, we note that this case was tried by a jury. With regard to jury trials our Supreme Court has instructed:

> An appellate court shall only set aside findings of fact by a jury in a civil matter if there is no material evidence to support the jury's verdict. Tenn. R. App. P. 13(d); *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006). In determining whether there is material evidence to support a verdict, we shall: "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *Barnes v. Goodyear Tire & Rubber Co*., 48 S.W.3d 698, 704 (Tenn. 2000) (citing *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978)). "Appellate courts shall

17

neither reweigh the evidence nor decide where the preponderance of the evidence lies." *Barnes*, 48 S.W.3d at 704. If there is any material evidence to support the verdict, we must affirm it; otherwise, the parties would be deprived of their constitutional right to trial by jury. *Crabtree Masonry Co.*, 575 S.W.2d at 5.

*Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009).

In the case now before us on appeal, the jury found that there was undue influence arising from a confidential relationship between the Executor and Ms. Hill and Deceased, that the Executor and Ms. Hill unduly profited from the Will, and that the Executor and Ms. Hill failed to prove the fairness of the transaction. As noted earlier, the Executor concedes in his brief that "[t]here is almost certainly sufficient evidence for a jury to find that a confidential relationship existed between [the Executor] and Pauline Hill and [Deceased]." The Executor is correct. As discussed more fully above, material evidence was presented to the jury which supports the jury verdict. With this in mind, we turn to the issues raised on appeal by the Executor.

"Executors are entitled to reasonable compensation for their services, Tenn. Code Ann. § 30–2–606 (1984) and to payment from the estate for reasonable expenses incurred in good faith for the exclusive and necessary benefit of the estate." *In re Estate of Wallace*, 829 S.W.2d 696, 700-01 (Tenn. Ct. App. 1992). As such, the possibility of payment for services grants a potential benefit to an executor. In his brief on appeal, the Executor argues that this potential benefit is too uncertain to constitute a benefit as it is dependent, in part, upon whether there are sufficient funds in the estate to pay the executor.

In his brief on appeal, the Executor also argues that being named as an executor is too uncertain to constitute a benefit because "a person nominated as executor gains nothing at all if the will in which the person is nominated is revoked by the testator," and "the nomination of an executor is subject to the nominated person surviving the testator." Both of these arguments, however, also would apply equally as well if the benefit involved the naming of a person as a beneficiary under the will. A named beneficiary could predecease the testator or the testator could revoke the will prior to death. Thus, being named as an executor is no more uncertain a benefit than being named as a beneficiary in the will. As such, this argument is without merit.

The Executor also argues in his brief on appeal that in order to prove undue influence, Allen was required to prove that the benefit to the Executor was direct and pecuniary. The Executor bases this argument upon the fact that prior Tennessee cases concerning undue influence document monetary benefits that accrued directly to the

dominant party. While we agree that it often has been the situation that the benefit in a case of undue influence has accrued directly to the dominant party, we hold that the benefit does not have to go directly to the dominant party so long as the benefit is to the advantage of the dominant party.

In the case now before us on appeal, the Executor and Ms. Hill received a benefit under the Will, in addition to the Executor being named executor, because under the Will members of the Executor's and Ms. Hill's family, their nieces and nephew, received Deceased's estate. For us to hold that the benefit in a case of undue influence must accrue directly to the dominant party would present a 'loophole' as it were wherein a dominant party could escape the presumption simply by, for example, exerting the undue influence to have the weaker party give the benefit to another member of the dominant party's family rather than directly to the dominant party. The dominant party could exert undue influence and have the weaker party grant the benefit to the dominant party's spouse, child, or any other family member with whom the dominant party had a relationship. Such a scenario would only encourage attempts to exert undue influence. We find and hold that the Executor and Ms. Hill also received a benefit under the Will when members of their family were named as the beneficiaries of Deceased's estate under the terms of the Will.

Additionally, while "[t]he existence of a confidential relationship is one of the 'suspicious circumstances' most frequently relied upon to show undue influence," and, as noted above, in certain circumstances a confidential relationship can give rise to a presumption of undue influence, the presumption is not the only way in which undue influence may be proven. *In re Armster*, No. M2000-00776-COA-R3-CV, 2001 WL 1285904, at *13-14 (Tenn. Ct. App. Oct. 25, 2001), *no appl. perm. appeal filed* (stating "Without the presumption, Appellant had the burden of proving undue influence by proof of suspicious circumstances."). As noted above:

> The suspicious circumstances most frequently relied upon to establish undue influence are: (1) the existence of a confidential relationship between the testator and the beneficiary; (2) the testator's physical or mental deterioration; (3) the beneficiary's active involvement in procuring the will. *See In re Elam's Estate*, 738 S.W.2d 169, 173 (Tenn. 1987); *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Taliaferro v. Green*, 622 S.W.2d at 835–36.

> Other recognized suspicious circumstances include: (1) secrecy concerning the will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the will; (4) the testator's illiteracy or blindness; (5) the unjust or unnatural nature of the will's terms; (6) the

19

testator being in an emotionally distraught state; (7) discrepancies between the will and the testator's expressed intentions; and (8) fraud or duress directed toward the testator. *See Halle v. Summerfield*, 199 Tenn. at 454–57, 287 S.W.2d at 61–62; *American Trust & Banking Co. v. Williams*, 32 Tenn. App. 592, 606–07, 225 S.W.2d 79, 85 (1948); *see also* 1 *Pritchard on the Law of Wills and Administration of Estates* § 145 (4th ed. 1983); 25 *Tenn. Jur*. Wills § 24 (1985); Tennessee Pattern Instructions—Civil § 11.59.

*Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989).

In his reply brief on appeal, the Executor argues that "proof of undue influence using 'suspicious circumstances' was not an option under the law of this case." The Executor asserts that the jury instructions and the jury verdict form provided for the possibility of the presumption of undue influence, but did not provide for the possibility of proving undue influence absent the presumption. We disagree.

A careful and thorough review of the Trial Court's instructions to the jury reveals that in addition to charging the jury about the presumption of undue influence, the Trial Court also charged the jury:

In determining the issue of undue influence, you may consider, among other things, the following. Do the provisions of the will favor people who have not blood relationship to the makers of the will over people who have a blood relationship? Do the terms of the will unduly benefit the chief beneficiaries of the will? Are the terms of the will different from the expressed intentions of the maker of the will? Did the chief beneficiary's relationship to the person making the will give the beneficiaries an opportunity to influence the terms of the will? Did the mental and physical condition of the maker of the will allow the maker's freedom of choice to be overcome by the actions of others? Did the beneficiaries of the will actively take part in determining the provision of the will or in causing it to be executed?

Thus, the Trial Court adequately and appropriately charged the jury both with instruction regarding the finding of a presumption of undue influence and with instruction involving the possibility of finding undue influence absent the presumption.

As for the jury verdict form, as discussed above, it stated, in pertinent part:

Did Judy Allen, by a preponderance of the evidence, prove that there was undue influence arising from a confidential relationship between Kenneth Hill and Pauline Hill and the deceased, Ida Lucille Land?

This question allowed the jury to determine if there was undue influence arising from the confidential relationship either with the presumption, or absent the presumption but arising from other suspicious circumstances. The jury verdict form did not limit the jury in the manner argued by the Executor. The jury instructions and the verdict form did not limit Allen to proving undue influence only by proving a confidential relationship, which she did prove. Allen was free to show other suspicious circumstances relevant to the question of undue influence.

We next consider whether the Trial Court erred in denying the Executor's motion for directed verdict. Our Supreme Court discussed the standard under which an appellate court must review a motion for a directed verdict in *Johnson v. Tennessee Farmers Mut. Ins. Co.*, stating:

> In reviewing the trial court's decision to deny a motion for a directed verdict, an appellate court must take the strongest legitimate view of the evidence in favor of the non-moving party, construing all evidence in that party's favor and disregarding all countervailing evidence. *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn. 2003). A motion for a directed verdict should not be granted unless reasonable minds could reach only one conclusion from the evidence. *Id.* The standard of review applicable to a motion for a directed verdict does not permit an appellate court to weigh the evidence. *Cecil v. Hardin*, 575 S.W.2d 268, 270 (Tenn. 1978). Moreover, in reviewing the trial court's denial of a motion for a directed verdict, an appellate court must not evaluate the credibility of witnesses. *Benson v. Tenn. Valley Elec. Coop.*, 868 S.W.2d 630, 638–39 (Tenn. Ct. App. 1993). Accordingly, if material evidence is in dispute or doubt exists as to the conclusions to be drawn from that evidence, the motion must be denied. *Hurley v. Tenn. Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn. Ct. App. 1995).

*Johnson v. Tennessee Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006).

The Executor moved for a directed verdict on the ground that Allen allegedly failed to prove a benefit to the Executor and Pauline Hill which resulted from the Will. As discussed above, Allen proved that the Executor and Pauline Hill benefitted from the Will both because members of their family were the named beneficiaries under the Will and because the Executor was named as the executor under the Will. It is clear that

reasonable minds could not reach only the conclusion that Allen failed to prove a benefit as the reasonable jury in the case now before us found otherwise.  As discussed more fully above, there was material evidence which supports the jury's verdict.  Just as there was material evidence sufficient to support the jury's verdict, there was material evidence presented which required the motion for a directed verdict be denied.  Given all this, we find no error in the Trial Court's refusal to grant the Executor's motion for a directed verdict.

As there is material evidence to support the jury's verdict, and we find no reversible error, we affirm the Trial Court's June 8, 2017 Final Decree entered upon the jury's verdict.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below.  The costs on appeal are assessed against the appellant, Kenneth L. Hill, and his surety.

_____
D. MICHAEL SWINEY, CHIEF JUDGE